**PRELIN INDUSTRIES, INC., Plaintiff,**

v.

**G & G CRAFTS, INC., and George E. Barrow, Defendants.**

**Civ. A. No. Civ–72–95.**

United States District Court,
W. D. Oklahoma.

Sept. 15, 1972.

John B. Hayes, Watts, Looney, Nichols & Johnson, Oklahoma City, Okl., Jack A. Kanz, Dallas, Tex., for plaintiff.

Jerry J. Dunlap and William R. Laney, Dunlap, Laney, Hessin & Dougherty, Oklahoma City, Okl., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHANDLER, District Judge.

This cause having come on for trial on September 6, 7 and 8, 1972 by the Court sitting without a jury, the parties appearing in person and by counsel, and the Court having considered the testimony and exhibits presented at the trial, all deposition testimony and exhibits, and the briefs of the parties, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### THE PARTIES

1. Plaintiff, Prelin Industries, Inc., is a Texas corporation, having its principal place of business in Dallas, Texas, and engaged in the business of manufacturing and selling electric oil refiners. The President of Plaintiff is, and was at the time of filing of this suit, Glen R. Priest.

2. Defendant, George E. Barrow, is an individual residing in Enid, Oklahoma, and is the President of the Defendant G & G Crafts, Inc.

3. Defendant, G & G Crafts, Inc., is a corporation of the state of Oklahoma, having its principal place of business in Enid, Oklahoma, and is engaged in the manufacture and sale of electric oil refiners.

4. Plaintiff and Defendants are in competition in the manufacture and sale

of electric oil refiners. Electric oil refiners are devices used primarily on automobiles for cleansing the engine lubricating oil by removing both solids and volatiles (such as water and gasoline) from the oil as the oil is being circulated through the engine.

## THE SUBJECT MATTER OF THE SUIT AND THE ISSUES

5. Plaintiff brought this suit against the defendants on February 14, 1971, contending

(a) that the Defendants have infringed United States Patent 2,839,196 to William C. Schwalge, granted on June 17, 1958, by manufacturing and selling electric oil refiners;

(b) that Defendants have unfairly competed with Plaintiff by:

(1) affixing decals or labels to oil refiner devices manufactured by Defendants and sold by Plaintiff, such decals or labels indicating that such devices were manufactured by the Defendant G & G Crafts, Inc., contrary to agreement with Plaintiff;

(2) falsely labeling such devices with labels indicating that they were made under U.S. Patent 3,550,781;

(3) marking such devices in the manner described for the purpose of surreptitiously learning the identity and location of Plaintiff's customers and distributors;

(4) fraudulently misrepresenting to Plaintiff's distributors and customers that Plaintiff was merely an agent of the Defendants, and/or that Plaintiff was owned by Defendants, and/or that Plaintiff was going out of business and would cease to provide its product for its customers and distributors, and/or that the business of Plaintiff had been acquired by the Defendants, and/or that Defendants had the sole and exclusive right to manufacture and sell the oil refiner device sold by Plaintiff, and that Plaintiff would no longer provide the product to its customers and distributors;

(c) that Defendants, to the damage of Plaintiff, have sold and are selling electric oil refiners to persons other than Plaintiff's distributors and customers with labels affixed thereto falsely designating Plaintiff as the source of origin, in violation of Title 15 United States Code Section 1121;

(d) that Defendants have violated Title 35 United States Code Section 292 by falsely mismarking oil refiner devices manufactured and sold by Defendants with United States Patent No. 3,550,781, such marking being effected for the purpose of deceiving the public.

6. Defendants, George E. Barrow and G & G Crafts, Inc., answered, denying liability of and for the charges asserted by Plaintiff, and by way of counterclaims, charged the Plaintiff with, inter alia:

(a) patent mismarking under 35 United States Code Section 292 by advertising and publicly representing that the electric oil refiners sold by Plaintiff were covered by one or more United States patents owned by Plaintiff or Glen R. Priest at a time when, in fact, neither the Plaintiff nor Glen R. Priest owned any United States patents;

(b) unfairly competing with the Defendants by:

(1) advertising the electric refiners sold by Plaintiff as being covered and protected by a United States patent owned by Plaintiff or Glen R. Priest when, in fact, neither Plaintiff nor Priest owned any United States patent;

(2) representing to its distributors, prospective distributors and the public at large that Plaintiff manufactured or controlled the manufacture of oil purifier and refiner devices being sold by Plaintiff, fully knowing that Defendants alone were the manufacturers of such devices and were completely independent of Plaintiff;

(3) subsequently to February 1, 1971, representing to the public at large and prospective distributors that Plaintiff was the exclusive distributor of electric oil refiners manufactured by Defendants

when, in fact, at that time Plaintiff was merely a non-exclusive distributor of such refiners, and Defendants had the right to also distribute and sell such devices;

(4) subsequently to December 7, 1971, representing to its distributors and to prospective distributors and customers that Defendants had no right to control or intervene in any way in the marketing practices of Plaintiff when, in fact, the contract then in effect between Plaintiff and Defendants expressly granted to Defendants the right to oversee, control and intervene in the marketing practices of Plaintiff;

(c) violation of the Anti-Trust Laws of the United States and of the state of Oklahoma by, inter alia,

(1) entering into contracts with distributors of its electric oil refiners based upon falsely represented ownership or control of patents by Plaintiff;

(2) contracting for the sale and distribution of electric oil refiners upon the condition or understanding that the purchasers thereof from Plaintiff for resale shall not deal in the oil refiner devices of a competitor, or in any competitive oil refiner devices;

(3) conspiring to deter or eliminate competition in electric oil refiners by falsely stating or implying that the electric oil refiners marketed by Plaintiff were manufactured by Plaintiff, or that Plaintiff controlled their manufacture;

(4) falsely representing itself to possess sole and exclusive rights to sell electric oil refiner devices so as to portray and imply that no other sources of such devices existed, and thus deter efforts or designs to seek other competitive sources of such devices when Defendants legitimately constituted one such other source;

(5) conditioning the sale of oil refiner and purifier devices to distributors upon the agreement of such distributors not to compete with Plaintiff in the sale of any such devices or similar devices for a period of two years after such distributorship is terminated;

(6) conspiring, contracting and acting in restraint of trade and commerce among the several states in electric oil refiners by falsely asserting ownership of Schwalge U.S. Patent 2,839,196.

7. Between September of 1968 and the time of bringing of this suit, Plaintiff and Defendants constituted the sole known sources of electric oil refiner devices in the United States.

## CHRONOLOGICAL SEQUENCE OF EVENTS AND ACTS OR THE PARTIES

8. In about 1961 or 1962, Defendant George E. Barrow commenced to sell in and around Enid, Oklahoma electric oil refiner devices manufactured by the Reclaimo Company, an Illinois corporation, with a principal place of business at Skokie, Illinois.

9. The Reclaimo electric oil refiners sold by Defendant George E. Barrow were made under William C. Schwalge United States Patent 2,839,196, a patent at that time owned by The Reclaimo Company, along with several other patents issued to William C. Schwalge on oil reclaimer devices.

10. In the middle of 1963, The Reclaimo Company encountered severe financial difficulties and ceased doing business, and as a result of this cessation, George E. Barrow could no longer sell electric oil refiners manufactured by that company.

11. In late 1963 or early 1964 George E. Barrow communicated to one or more officials of The Reclaimo Company, his desire to commence to manufacture electric oil refiners similar to those which had been manufactured by The Reclaimo Company and previously sold by him.

12. In late 1964, George E. Barrow, doing business as G & G Crafts in Enid, Oklahoma, commenced to manufacture and sell electric oil refiners.

13. No representative of the Reclaimo Company ever contended that the oil refiners made by Defendants infringed the Schwalge patent 2,839,196.

14. From 1964 until 1968, Defendants Barrow and G & G Crafts continued to manufacture electric oil refiner devices, and early during this period, modified or altered the design of the electric oil refiner device. The electric oil refiner which was manufactured after such modification included a hollow body or housing divided by a vaporization plate into a vaporization chamber in the upper portion of the housing, and a filter material chamber in the lower portion of the housing. The filter material chamber was filled with a fibrous material, such as cotton, and the vaporization plate carried upstanding protuberances or bosses having small holes formed therethrough to conduct oil from the bottom side of the vaporization plate to the top side of the protuberances or bosses. The holes formed through the plate were cylindrical, vertically extending, straight holes. The housing was covered by a removable lid which carried a heater for heating oil passing over the bosses onto the vaporization plate. Gases vaporized from the oil were vented through a hole in the lid.

## THE BARROW–PRELIN ASSOCIATION

15. In the summer of 1968, George E. Barrow for the first time met Jimmy C. Linch and Glen R. Priest, and after consulting with them, entered into a joint venture defined by a written contract executed September 10, 1968, which contract was between an Oklahoma corporation, Prelin Products, Inc. to be formed by Priest and Linch, and George E. Barrow, doing business as G & G Crafts. The contract provided that Prelin would be the exclusive distributor of the electric oil refiner manufactured by Barrow.

16. The contract of September 10, 1968 further provided, inter alia, that Barrow (G & G Crafts) would hold Prelin harmless "from any litigation which might arise from patents on the product."

17. Jimmy Linch was the first president of Prelin Products, Inc., and Glen R. Priest was its secretary.

18. In the late summer of 1968, and prior to entering into the September 10, 1968 contract, Defendant Barrow disclosed to Linch and Priest, the history of The Reclaimo Company as known to him, and the relationship of his electric oil refiner which he was then manufacturing to that company, and to Schwalge United States Patent 2,839,196 which he understood had been owned by The Reclaimo Company at the time that The Reclaimo Company ceased doing business. Barrow further explained to Priest and Linch in their initial meetings that he understood that the Reclaimo Company had many years earlier become bankrupt, and had had problems with creditors.

19. At the time that the Defendants first contacted Linch and Priest, and at the time that Plaintiff and Defendants entered into their initial contract dated September 10, 1968, Defendant had a small manufacturing business, and its principal product at that time was the electric oil refiner which had been manufactured by Defendants for several years. Priest and Linch became enthusiastic about the electric oil refiner which Barrow and G & G Crafts were then manufacturing.

20. In October or November of 1968, Glen R. Priest communicated with Fred Becker of Waco, Texas relative to the possibility of Becker investing in the distribution of the electric oil refiner devices manufactured by Barrow and G & G Crafts, and distributed by Prelin Products, Inc. under their contract of September 10, 1968.

21. Fred Becker then, in November of 1968, made an investigation of the ownership of Schwalge United States Patent 2,839,196 which had been reported to him via Priest as being a patent related to the electric oil refiner device then being manufactured by Barrow

and G & G Crafts, and to be sold by Prelin.

22. Becker, through a patent assignment search, determined that the Schwalge patent had last been owned by the Reclaimo Company, and appeared by the records of the United States Patent Office to still be owned by that company.

23. Sometime during the latter half of 1968, Barrow and G & G Crafts modified further the electric oil refiner device being manufactured by G & G Crafts to provide a small cylindrical counterbore extending downwardly into each of the bosses provided in the vaporization plate of the electric oil refiner device, such counterbore communicating at its lower end with a small hole previously formed vertically through the bosses, and forming with such small hole, a vertical conduit or passageway for the flow of oil from the lower side of the vaporization plate to the top side of the boss.

24. Acting under the joint venture arrangement between Barrow and G & G Crafts, as manufacturers, and Prelin Products, Inc., as exclusive distributors, Prelin Products, Inc. engaged in a pyramid or multi-level type marketing system in which Prelin sold the electric oil refiners to persons variously situated within a pyramid type selling system. This system included persons referred to as executive distributors at the top of the pyramid system, with so-called wholesalers, distributors and managers at various lower levels in the system. Prelin sold the electric oil refiners to each of these types of distributors at different prices without true regard, in substance, for the quantity of refiners which either or any of them purchased.

25. Prior to February of 1969, Glen R. Priest advised George E. Barrow that the patent assignment search procured by Becker had revealed that the Reclaimo Company still appeared, of record, to own Schwalge U.S. Patent 2,839,196, and Priest was advised by Barrow that Barrow did not believe that anyone could

obtain clear title to that patent because of the financial and legal difficulties which he believed the Reclaimo Company had encountered, and suggested to Priest that "sleeping dogs" be permitted to remain in a state of slumber.

### THE RECLAIMO COMPANY

26. On November 12, 1964, the Reclaimo Company was dissolved by the state of Illinois for failure to pay franchise taxes.

27. The Reclaimo Company remained dissolved, insolvent and out of business from 1964 until 1969, and during the years 1964 through 1968 did not have any Board of Directors or currently elected officers.

### PURPORTED ACQUISITION OF SCHWALGE PATENT

28. After Fred Becker determined the record ownership of the Schwalge patent, Malcolm E. Hinkle of Pampa, Texas, a business associate of Fred Becker, traveled to Chicago, Illinois in January of 1969 and located Joseph Ruiz, who was the last President of the Reclaimo Company at the time of its dissolution by the state of Illinois in 1964, and who, in early 1969, was residing in Florida and engaged in business there.

29. Ruiz traveled from Florida to Chicago, and Hinkle and Ruiz entered into a written option agreement dated January 11, 1969 by the terms of which, Ruiz as an individual and a majority stockholder of the Reclaimo Company, granted to Hinkle, an option to purchase Schwalge United States Patent 2,839,196. This written option agreement indicated on its face that the Reclaimo Company was, at the time of execution of the option, a company which was defunct for failure to pay franchise taxes.

30. After Hinkle entered into the option agreement with Joseph Ruiz, as an individual and majority stockholder of Reclaimo, for Ruiz to assign to Malcolm Hinkle, all of Ruiz' right, title and inter-

est in and to Schwalge United States Patent 2,839,196, Fred Becker and Malcolm E. Hinkle retained an attorney in Chicago to undertake to have the Reclaimo Company reinstated for the purpose and design of clothing that company with some ostensible authority to convey some interest in, or title to, Schwalge U.S. Patent 2,839,196 to Hinkle and Becker.

31. The attorney retained by Hinkle and Becker procured from Joseph Ruiz, a purported list of directors of the Reclaimo Company for the years during which that company had been defunct and dissolved, and in providing such list of directors, Ruiz concocted fictitious directors, since there had been no directors during those years, and the company had not functioned. Moreover, one of the persons named by Ruiz as an alleged director during the years when the Reclaimo Company was dissolved was his wife, when in fact, he had not been married to her during the year 1964, which was one of the years for which such directors were named, nor had she then been known by the name supplied by Ruiz. In 1963 all of the directors of Reclaimo except Ruiz had filed written resignations and shortly thereafter Ruiz, himself, entered a totally unrelated business. In 1964 the *de facto* existence of Reclaimo had completely terminated.

32. The attorney representing Hinkle and Becker then prepared a petition for corporate reinstatement for signature by Ruiz, which petition implied that the Reclaimo Company had not been totally out of business during the years between 1964 and 1969, implied that Ruiz had not been properly served by the Sheriff of Cook County, Illinois, for purposes of judicially dissolving the Reclaimo Company in 1964, and stated that such directors of the defunct Reclaimo Company as were alleged to have existed had known nothing of the dissolution of that company until January 14, 1969, the latter in contradiction of the knowledge reflected in the Hinkle-Ruiz option agreement of January 11, 1969. The petition also had an incorrect corporate seal

thereon. Moreover, at the time of formulation of the back reports necessary for filing with the Secretary of State of the state of Illinois for reinstating the Reclaimo Company, none of the directors named in such back reports had ever been elected, or had functioned during that time, and there were no directors of that company in the year 1969 at the time the petition was prepared.

33. In August of 1969, the petition for reinstatement of Reclaimo prepared by the Hinkle and Becker attorney, and signed and verified by Ruiz, was filed in the Circuit Court of Cook County, Illinois, and was not opposed. The Circuit Court, as a matter of course, in such circumstances, granted the request of the petition, and vacated the order of dissolution by which the Reclaimo Company had been dissolved in 1964. This reinstatement of the Reclaimo Company was based upon a petition which was false in at least one of its allegations and provisions, and which was misleading and employed solely for the purpose of clothing the Reclaimo Company with ostensible corporate authority and status to convey away to Hinkle and Becker, what all concerned understood to be its sole real remaining asset, the Schwalge United States Patent 2,839,196. There were, at that time, unsatisfied creditors of the old Reclaimo Company, and these were not advised of the efforts to reinstate that company.

34. Subsequently to August, 1969, Joseph Ruiz and his wife and Howard Diercks met as a non-elected, interim Board of Directors of the reinstated Reclaimo Company for the purpose of conveying Schwalge United States Patent 2,839,196 to Malcolm E. Hinkle. Special shareholders meetings of the Reclaimo Company were convened during the fall of 1969 and spring of 1970 for the purpose of conveying the Schwalge patent to Hinkle, which patent the company records indicate was then considered as the sole asset of the company.

35. In the described shareholders meetings, some shareholders of the com-

pany were not in attendance in person or by proxy because they had not been notified of the meetings.

36. On January 12, 1970, Joseph A. Ruiz, for an unnamed consideration, granted an extension of the January 11, 1969 option with Hinkle, such extension being granted to Hinkle and his business associate, Fred Becker, and extending the option so as to allow it to expire on March 15, 1970.

37. On or about March 20, 1970, the attorney for Hinkle and Becker was advised by the office of the Secretary of State of Illinois that the Reclaimo Company was then in good standing.

38. On March 9, 1970, Joseph A Ruiz, conveyed to the Reclaimo Company, his interest in the option agreement with Hinkle and Becker.

39. On March 23, 1970, the Reclaimo Company undertook to convey "all right, title and interest in and to" Schwalge United States Patent 2,839,196 to Malcolm E. Hinkle, Fred Becker and H. T. Strausberger, Jr., such conveyance being made subject to the option agreement of January 11, 1969 between Joseph Ruiz and Malcolm Hinkle, and providing that Hinkle, Becker and Strausberger and their assignees would pay to the Reclaimo Company, a royalty of 2½% for each electric oil refiner sold by Hinkle et al. or their assignees in consideration of technical services rendered to those individuals by the Reclaimo Company.

40. After the signing of the written option agreement of January 11, 1969 between Hinkle and Joseph Ruiz, Hinkle and Becker met with Glen R. Priest and Jimmy Linch in Amarillo, Texas, and at that time advised Priest and Linch that they were endeavoring to purchase the Schwalge U. S. Patent 2,839,196 from Joseph Ruiz, an individual. Hinkle and Becker further advised Priest and Linch that they would try to work out some arrangement to either license Priest and Linch (or Prelin) under the Schwalge patent, to sell the electric oil refiners manufactured by G & G Crafts, or they would, at some time in the future, con-

sider selling this patent to Prelin Products, Inc., or they would possibly manufacture the devices themselves. No consideration or time certain was agreed upon for selling or licensing the Schwalge patent to Prelin Products, Inc., or to Priest or Linch as individuals.

41. At some time during the spring of 1969, Fred Becker and Malcolm E. Hinkle traveled to the G & G Crafts plant in Enid, Oklahoma and advised the Defendant Barrow that they owned or controlled Schwalge United States Patent 2,839,196, and that they believed that Mr. Barrow and G & G Crafts were infringing this patent by manufacturing and selling electric oil refiners of the type made by Barrow and sold by Prelin. The electric oil reclaimer being manufactured by Barrow at that time, and at all subsequent times up to the date of the bringing of this suit, included the structure described in Finding 14, modified as described in Finding 23.

42. Barrow, at the time of the spring-1969 visit by Becker and Hinkle, denied to them that the device he was manufacturing infringed the Schwalge patent, and denied that Becker and Hinkle could have good title to that patent.

## THE ENTRY OF UNIVERSAL PRODUCTS, INC.

43. On January 20, 1969, Prelin Products, Inc., through its President, Linch, entered into a written contract with a Texas corporation, Universal Products, Inc. for the sale of electric oil refiners. Pertinent provisions of that contract were, inter alia, as follows:

8. It is further mutually agreed and understood between the parties hereto that Prelin Products, Inc. shall not enter into any marketing agreement with any party or parties, excepting Prelin Products marketing organization and sales personnel associated therewith, other than the said Universal Products, Inc. until such agreement shall be mutually and jointly agreed to in writing by said parties; and further, the said Universal

Products, Inc. shall not enter into a joint marketing agreement or any other agreement related to the said Prelin "Electric Oil Refiner" with any party or parties other than their subsidiaries or affiliates until such agreement shall be mutually and jointly agreed to in writing by said parties.

10. It is further mutually agreed and understood between the parties hereto that said parties shall jointly agree on the marketing price changes, product development and marketing plan amendments; and further all sales and other literature, rules and regulations shall be standard between the parties. Advertising in relation to the products involving parties shall be approved by said parties.

14. It is further mutually agreed between the parties hereto that this entire contract is predicated on the assumption that the product identified is properly patented with rights patent to Gene Barrows and/or Prelin Products, Inc., and that there is no infringement on any other patents.

44. At the time of entering into the contract with Universal Products, Inc., the officers of Prelin were aware of the existence of the Schwalge patent, and its purported similarities to the device being manufactured by Defendants and sold by Prelin.

45. On May 9, 1969, Defendant Barrow applied for a United States patent on an electric oil refiner structure, which electric oil refiner included some of the structural features of the refiner which he and G & G Crafts were then manufacturing, and also depicted and claimed an electric heating element embedded in the vaporization plate of the refiner.

46. In applying for such United States patent, Defendant Barrow was encouraged to do so by Linch and Priest, and Prelin Products, Inc. published newsletters and advertising materials naming Barrow as the inventor of the electric oil refiner which he was then manufacturing, and which Prelin Prod-

ucts, Inc. was selling. Prelin Products, Inc. also advertised Barrow as its Consulting Engineer, and the expert on the technology of the electric oil refiner, and arranged for Barrow to lecture at Seminars and Opportunity Meetings sponsored by Prelin.

47. After applying for his patent, Barrow made a copy of this patent application available to Priest and Linch, and with their acquiescence, if not encouragement, the electric oil refiner devices manufactured by G & G Crafts and sold by Prelin were marked "Patent Pending".

48. The marketing system being used by Universal Products, Inc. was also a pyramid or multi-level marketing system, and was carried on throughout the United States through over 500 sub-distributors within the Universal Products system.

49. Manufacturing of electric oil refiners by Barrow and G & G Crafts, and selling of these devices through Prelin sub-distributors in the Prelin multi-level marketing system, and through Universal Products, Inc. continued through the year 1969. During this year, the drop shipping method of supplying product to Prelin sub-distributors was used by agreement of all parties, with Barrow and G & G Crafts, Inc. shipping directly to the Prelin distributors upon orders and appropriate shipping instructions being supplied by Prelin.

50. During the year 1969, and the first half of 1970, Barrow was frequently called upon by both Prelin and Universal Products, and the sub-distributors of each, to provide technical aid and assistance, and these sub-distributors were encouraged to contact Barrow for answers and solutions to technical problems and questions.

51. On February 16, 1970 G & G Crafts was incorporated as an Oklahoma corporation, G & G Crafts, Inc.

### THE AGREEMENT OF MARCH 2, 1970

52. On March 2, 1970, Prelin Products, Inc., George E. Barrow and G

& G Crafts, Inc. rewrote their contract of exclusive distributorship, with the new agreement superseding the prior agreement of September 10, 1968. The contract of March 2, 1970 provided that Prelin should continue to be the exclusive distributor of the electric oil refiner manufactured by Barrow and G & G Crafts, and further provided that in the event of the death or failure of either contracting party, the other would have the option to succeed to the other's business. At this time, the multi-level marketing system was continued by Prelin via Universal Products, Inc. and other distributors of Prelin.

53. By the terms of the March 2, 1970 contract, G & G Crafts, Inc. agreed to defend and indemnify Prelin against any claim of infringement asserted against Prelin as a result of their sales of oil refiners.

54. The March 2, 1970 contract was prepared by the attorney for Prelin.

55. During most of the existence of Prelin Products, Inc. it was the policy of this company to fix or establish the prices at which the electric oil refiners sold by it to its distributors could be resold by them at retail level.

56. On May 19, 1970, Malcolm E. Hinkle wrote separate, unrelated, identical letters to both Prelin Products, Inc. and G & G Crafts, Inc. charging each of them with infringing Schwalge U. S. Patent 2,839,196 by their manufacture and sale, respectively, of electric oil refiner devices. The attorney for Barrow responded to this charge by denying infringement. The attorney for Prelin responded to this charge by refusing to admit infringement, and expressing an interest in receiving a proposition for licensing or sale of the patent to Prelin by Hinkle, Becker and Strausberger.

57. Subsequently to May of 1970, some drop shipment of electric oil refiners by Barrow to Prelin sub-distributors continued, and Universal Products, Inc. continued to call on Barrow for technical assistance, and in some cases, for direct shipment of refiners to meet emergency situations. In the case of the latter sales, Barrow billed the sales to Prelin Products, Inc., and Prelin Products, Inc. was kept aware of such direct shipments by Barrow.

58. In the late summer and early fall of 1970, Barrow frequently objected to Prelin officials concerning the marketing methods and technical servicing of electric oil refiners sold by Prelin, with such objections being more specifically as follows:

(a) objection to improper installation of the refiners;

(b) objection to use of the pyramid system to "sell people rather than product";

(c) objection to the failure of Prelin to make available to new distributors technical training and instructions within the times and within the areas promised.

59. In October of 1970, Barrow demanded a meeting with the officers of Prelin and Universal Products in Oklahoma City, Oklahoma, and voiced his concern to these officers over the manner in which the electric oil refiner which he manufactured and they marketed was being sold and serviced. Barrow expressed it as a prime concern with him that the reputation of the product not be damaged by such marketing and servicing activities, saying that with him, the product and its reputation came first.

60. Commencing in about the summer of 1970, Prelin Products, Inc. undertook to curtail and eliminate all communications between its distributors within its pyramid type marketing system and George E. Barrow or any personnel of G & G Crafts, Inc.

61. At all times, all of the distributors within the Prelin marketing system, including those under Universal Products, Inc., were, by the terms of their distributorship contracts with Prelin and Universal Products, independent contractors.

62. The contracts of distributorship entered into between Prelin and its distributors provided that those distributors would not compete with Prelin in the sale of electric oil refiners for a period of two years following any termination of the contract of distributorship with Prelin.

63. Both Prelin and Universal Products followed a policy of advising and instructing all of the distributors within their respective multi-level distributing system that such distributors must refrain from dealing in competitive products upon penalty of being terminated as a distributor.

64. In November and December of 1970, relations deteriorated between Prelin and Universal Products, with the result that these companies determined in the course of several meetings to terminate their relationship to each other. At these meetings, it was agreed that upon such termination of the relationship between Prelin and Universal Products, the needs (for electric oil refiners) of those distributors who had been within the Universal Products marketing system would be supplied by the Defendant Barrow who would, in supplying this need, sell directly to these former Universal Products distributors.

## THE CONTRACT OF DECEMBER 7, 1970

65. In keeping with the contemplated termination of the relationship between Prelin and Universal Products, and the contemplated needs of distributors of electric oil refiners who had been within the Universal Products system, a new contract dated December 7, 1970 was executed between the Defendants Barrow and G & G Crafts, Inc. and the Plaintiff Prelin Products, Inc. which contract provided that upon the complete release of the agreement between Prelin and Universal Products, Inc., Prelin would become a non-exclusive distributor of electric oil refiners manufactured by Barrow and G & G Crafts, Inc. The contract of December 7, 1970 further provided that Barrow would be permitted to advise and intervene with respect to marketing procedures utilized in the future by Prelin, and provided that in all other respects, the contract dated December 7, 1970 and executed by Prelin, Barrow and G & G Crafts would supersede the agreement previously in existence between them and dated March 2, 1970. The contract of December 7, 1970 continued to expressly provide that G & G Crafts, Inc. and Barrow would indemnify Prelin against any charge of patent infringement brought against Prelin.

66. The contract of December 7, 1970 was drawn by the attorney for Prelin Products, Inc.

67. Subsequently to the execution of the agreement dated December 7, 1970 between Prelin Products, Inc. and George E. Barrow and G & G Crafts, Inc., and prior to January 15, 1971, Universal Products became defunct and insolvent and made a distribution for the benefit of creditors after selling its assets.

68. Subsequently to the execution of the contract of December 7, 1970, between Prelin and Barrow and prior to January 15, 1971, the contract between Prelin and Universal Products was terminated and the parties released from its terms, and at all times subsequently thereto up to September of 1971, that contract was treated as terminated in all dealings between Barrow and Prelin.

69. Pursuant to the new contract with Prelin by which that company became a non-exclusive distributor, Barrow entered into distributorship contracts with other entities, including some of the former distributors under the then defunct Universal Products, Inc., A & R Distributors of Enid, Oklahoma, and World Distributors of Miami, Florida. The first of these distributors was acquired and commenced to receive electric oil refiners from Barrow in late December of 1970 or January of 1971.

70. In February of 1971, Prelin decided to move its principal offices to Dallas, Texas, and the original company, Crelin Products, Inc. was superseded and replaced in all respects by a new company, Prelin Industries, Inc., a Texas corporation, having its principal place of business in Dallas, Texas. The latter company is the Plaintiff in the present suit, but for all practical purposes may be considered to be the same corporate entity as Prelin Products, Inc.

71. The President of Prelin Industries, Inc. from the time of its incorporation until January 10, 1972 was Warren J. Starnes.

72. At the time of the formation of Prelin Industries, Inc., Prelin was actively undertaking to curtail all drop shipping of electric oil refiners to its customers and distributors by Defendant G & G Crafts, Inc., and was undertaking to prevent these customers and distributors from communicating in any way with Barrow or G & G Crafts, Inc.

73. Throughout the history of Prelin Products, Inc. and Prelin Industries, Inc., Prelin conducted schools throughout the United States at which those who had already paid to become distributors in the Prelin pyramid or multi-level selling system were ostensibly given instructions in the manner of installation and operation of the electric oil refiners, the corporate makeup of Prelin and the proprietary rights and patent rights which Prelin purportedly owned in the electric oil refiner. These schools were held with an average frequency of twice per week, and were held throughout the United States. The cost of attending a school was $200.00, and the schools usually lasted for three days. Persons who were not paid-up distributors with the Prelin system, but were merely interested in buying a distributorship, were also encouraged to pay the "tuition fee" and attend these schools.

74. Commencing at least as early as April of 1971, Warren J. Starnes, who was both the President of Prelin Industries, Inc. and the instructor of its Executive Instruction Schools, represented at these schools that Prelin or Glen R. Priest owned the United States patents on the electric oil refiner which was then being marketed by Prelin, and was still being manufactured by George E. Barrow and G & G Crafts. Starnes further represented that Prelin was the exclusive distributor of the electric oil refiner, and that the distributors would encounter no competition in their sales of this electric oil refiner. In many of the schools conducted by Prelin, the persons attending those schools were left by Starnes with the impression that Prelin controlled or owned the facility which manufactured the electric oil refiners, and those in attendance at the schools, both Prelin distributors and prospective Prelin distributors, were discouraged from making any contact with the factory where the refiners were manufactured.

75. During the existence of Prelin Industries, Inc., it was the policy of this company to fix or establish prices at which the electric oil refiners sold by it to its distributors would be resold by them at retail level.

76. On December 29, 1970, United States Patent 3,550,781 issued to George E. Barrow, and depicted and described an electric oil refining or reclaiming device having some structural elements like those which were included in the electric oil refiner then being manufactured by Barrow and sold by Prelin.

77. In the spring of 1971, Barrow procured boxes bearing the trademark logo "Dual Purpose", and started to package or box the electric oil refiners in such boxes when they were sold to distributors other than Prelin. The electric oil refiners sold to Crelin continued to be boxed by Barrow in boxes having thereon the Prelin logo. Glen R. Priest became aware of such marking and sales under the Dual Purpose mark shortly after it was commenced by Defendants, and acquiesced in such marking and sales.

78. Around the beginning of the summer of 1971, the Defendant Barrow commenced to place the number of his United States patent 3,550,781 on the electric oil refiners being manufactured by him and still being sold by Prelin. Barrow did so in good faith since he did not know or understand that the claims of his patent each included limitations not employed in his commercial product. Barrow thus had no intention of deceiving the public, and the incorrect marking which thus resulted did not result from any bad faith or fraudulent intent upon his part.

79. The incorrect marking by Barrow did not, in and of itself, mislead or confuse anyone.

80. At some time between February of 1971 and June of that year, Barrow first learned from third parties of the plan or intention of Prelin Industries, Inc. to acquire or construct a manufacturing facility of its own by the use of which it could manufacture its own electric oil refiners.

81. At some time within several months following the ostensible conveyance of some interest in the Schwalge patent to Hinkle, Becker and Strausberger, one of this group communicated the terms and provisions of this conveyance of some interest in this patent to them to officials of Prelin by forwarding to such officials, a copy of the complete agreement between Hinkle et al and Reclaimo dated March 23, 1970, which complete agreement showed on its face that such agreement was subject to the terms of the option agreement between Ruiz and Hinkle dated January 11, 1969.

82. The Starnes representations at Executive Instruction Schools concerning ownership by Prelin or Glen R. Priest of patents covering the electric oil refiners then being sold by Prelin were made throughout the country at a majority of the schools that Prelin sponsored which were taught by Starnes in 1971.

83. During the spring of 1971, Prelin on at least one occasion, undertook to discourage and prevent contract between Barrow and persons who were not then Prelin distributors, and who were thus able to freely enter into a contract with either Defendants or Prelin to receive electric oil refiners from them for resale.

84. In the early summer or late spring of 1970, George E. Barrow and G & G Crafts began to place on electric oil refiners made and sold by them, a tag or tags indicating that the electric oil refiners being manufactured by G & G Crafts, Inc. were in fact manufactured by that company, and identifying the company's location as Enid, Oklahoma.

85. In August of 1971, Prelin, through its employee Larson, began to investigate the location and acquisition of a facility for manufacturing electric oil refiners in the state of Mississippi.

86. At some time between September 1 and November 1, 1971, Prelin rented a building in Sherman, Mississippi, and started to outfit and equip that building for the production of electric oil refiners.

87. Plaintiff did not advise or inform Defendants of its intention to manufacture electric oil refiners, or of its actions in acquiring a facility in Mississippi to carry this out, but Defendant Barrow, through his own investigations, discovered this plan and these actions of the Plaintiff.

88. On August 12, 1971, Hinkle, Becker and Strausberger sent to the Plaintiff and to Defendants, separate, individual unrelated letters offering to sell to either of them, Schwalge United States Patent 2,839,196.

89. The Defendant Barrow, in responding to the August 12, 1971 letter from Hinkle et al., expressed the conviction of Barrow that he had no need of the Schwalge patent, and that he believed that the patent which he had previously obtained on an oil refiner device covered the electric oil refiner which he was making. The letter of response did indicate, however, that Barrow would be interested in hearing what sort of prop-

osition Hinkle et al had in mind, and further emphatically stated that before any further interest might be manifested by Barrow in the obtainment of the Schwalge patent, it would be necessary for Hinkle et al. to clearly establish the validity of their claim to title to the patent.

90. Immediately after the August 12, 1971 letter from Hinkle et al. offering to sell the Schwalge patent, defendant Barrow conferred with Glen R. Priest, Chairman of the Board of Prelin at that time, and advised Priest that Barrow was still of the conviction that a good title could not be obtained to the Schwalge patent, and reiterated his often expressed opinion that the course of action which should be followed with respect to the patent was simply to "let sleeping dogs lie."

91. In October of 1971, Prelin commenced negotiating with Hinkle et al., through the latter's attorney, for the purchase of the Schwalge patent. On October 20, 1971, Prelin, through its attorney, offered to pay to Hinkle et al., $10,000.00 for the transfer to Prelin of the title to the Schwalge Patent, such payment and such offer to be expressly conditioned upon the satisfaction of Prelin's patent counsel that Hinkle et al. could convey a good and marketable title to the Schwalge patent. The exchanges of correspondence and communications between Prelin and Hinkle et al. with respect to the Schwalge patent were not revealed to the Defendants.

92. After a series of exchanges of correspondence between the attorney for Prelin and the attorney for Hinkle et al., it was finally decided in November of 1971 that Prelin would pay $10,000 to Hinkle et al., for whatever right, title and interest Hinkle et al. had in the Schwalge patent. Almost as soon as this agreement was reached, however, the attorney for Hinkle et al. wrote to Prelin's attorney advising him that he had just recalled or discovered the requirement in the conveyance of the Schwalge patent from the reinstated Reclaimo Company to Hinkle et al., that

Hinkle et al., and any assignee of them, were required by the terms of the Reclaimo to Hinkle et al. assignment to pay to Reclaimo, a 2½% royalty, based on the net selling price, of all electric oil refiners which came under the Schwalge patent and were sold by Hinkle et al. or any such assignee.

93. In view of this requirement in the assignment from Reclaimo to Hinkle et al., the attorney for Hinkle et al. advised the attorney for Prelin that it would be necessary for Prelin to accept and recognize this obligation running with the title to the patent, and that they would therefore have to make some arrangement to accept and recognize this provision before Hinkle et al. could assign whatever interest they had in the Schwalge patent to Prelin. In advising Prelin of this requirement, the attorney for Hinkle et al. again forwarded to Prelin's attorney, a complete copy of the March 23, 1970 agreement between Reclaimo and Hinkle et al., showing that the assignment from Reclaimo to Hinkle et al. was subject to the option agreement between Ruiz and Hinkle of January 11, 1969.

94. In order to satisfy Hinkle et al. relative to the requirement for payment of royalty as set forth in the assignment of the Schwalge patent from Reclaimo to Hinkle et al., Prelin, through its attorney, proposed to indemnify Hinkle et al. for any claim which might be asserted by Reclaimo or Ruiz under the requirement for royalty payment, and pursuant to this proposal, submitted an indemnity agreement to Hinkle et al. in which Prelin undertook to indemnify Hinkle et al. against any claim asserted by Reclaimo under this provision. Glen R. Priest and Warren J. Starnes, Chairman of the Board and President, respectively, of Prelin, undertook to personally guarantee such indemnification.

95. In November of 1971, Barrow discovered for the first time that Prelin was negotiating with Hinkle et al. for the acquisition of whatever interest the latter had in the Schwalge patent. Upon determining this, Barrow then of-

fered to buy the patent from Hinkle et al. for $12,000.00 but this offer was rejected by Hinkle et al. on the grounds that they were already committed to sell the patent to Prelin.

96. On December 9, 1971, Hinkle, Becker and Strausberger executed an assignment of their rights in Schwalge U. S. Patent 2,839,196 to Prelin Industries, Inc.

97. On August 26, 1971, Priest represented to a large meeting of Prelin distributors in Minneapolis that he owned the patents on the electric oil refiner device which Prelin was then distributing.

98. Prelin, through its President, Warren J. Starnes, misrepresented at Executive Instruction Schools in Houston, Texas; Minneapolis, Minnesota; Fargo, North Dakota; Anaheim, California; Washington, D. C.; Dallas, Texas; Albuquerque, New Mexico, and Sacramento, California, that Prelin or Glen R. Priest owned United States patents on the electric oil refiner device being distributed by Prelin and manufactured by G & G Crafts, Inc. Starnes further misrepresented at these executive instruction schools that Prelin was the exclusive distributor of the electric oil refiners which it sold, and which was presented to the distributors at these schools, and that the Prelin distributors then existing and who might come into the Prelin pyramid marketing system would encounter no competition in the sale of such electric oil refiners.

99. On February 14, 1972, Prelin brought the present suit against Barrow and G & G Crafts, charging the Defendants here with infringement of the Schwalge patent, and with the other charges hereinbefore described, and the Defendants answered and counterclaimed, also in the manner previously described in these findings. Prelin had not previously charged the Defendants with infringing the Schwalge patent.

100. A preliminary injunction sought by Prelin against Barrow and G & G Crafts by which the Plaintiff attempted to immediately prevent and terminate all further manufacturing activities by the Defendants was denied by this Court on February 29, 1972.

101. Between March 1, and March 30, 1972, Prelin, through its counsel, undertook an intensive campaign of warning and threatening patent infringement suits against every distributor and customer of the Defendants who had previously been dealing with the Defendants to purchase and distribute electric oil refiners made by the Defendants, and sent numerous letters threatening suit within ten days unless such sales and distribution were stopped. The Plaintiff also instructed its patent counsel to direct such letters to at least four of its own distributors located in several different states, threatening these distributors with patent infringement suits if they continued to sell electric oil refiners. In fact, most of these Prelin distributors had not at that time, and never have as of the present time, sold any electric oil refiners manufactured by the Defendants and purchased from the Defendants, but rather, have always sold only electric oil refiners distributed by the Plaintiff. Two of these Prelin distributors have, because of such threats, terminated further sales and distribution of electric oil refiners of any type.

102. None of the persons threatened with suit in the letters disseminated by Prelin through its attorney have actually been sued by that company, but substantially all of the distributors who were threatened in the manner described have ceased to buy electric oil refiners from either Prelin or the Defendants, and as a result of this, the Defendants' business has been substantially totally destroyed, and its operations forced to be terminated.

103. Between March 1, 1972 and March 20, 1972, an attorney for Prelin notified an executive of a large potential customer of both Prelin and the Defendants (U-Haul International) that the Defendants had been forced out of business by the actions of Prelin in bringing suit against the Defendants and threat-

ening its distributors, causing such large potential customer to become concerned about, and have reservations with regard, to, the capability of Defendants to constitute a viable source of electric oil refiners should that customer choose to deal with the Defendants.

104. Between January 1, 1971, and December 9, 1971, the Plaintiff, by its actions and dealings, set about to sever its relations with the Defendants, and to place itself in a position of dominance in the business of manufacturing and selling electric oil refiners, with the ultimate objective of obtaining complete control of the electric oil refiner market in the United States.

105. In covertly moving to negotiate with Hinkle et al. for the acquisition of the Schwalge patent, Priest and Starnes acted inequitably and their hands were not clean when they set upon a deliberate course to acquire that patent.

106. The successive owners of the Schwalge patent had, in fact, slept on their rights for at least seven years prior to the time that Priest and Starnes undertook to acquire the Schwalge patent on behalf of the Plaintiff, Prelin, and but for the Plaintiff's action in acquiring this patent to further its unlawful ends, it is unlikely that anyone, including Hinkle, Becker and Strausberger, would have actively asserted infringement of the patent against the Defendants.

107. The attempts of Hinkle et al., utilizing Joseph Ruiz as their instrument, to revive or reinstate the Reclaimo Corporation in Illinois, after that corporation had been dissolved and dormant for several years, involved the perpetration of a fraud on the Circuit Court of Cook County, Illinois in the manner of presentation of the petition for reinstatement, and the content of that petition.

108. There is evidence in the record that Mr. William C. Schwalge's heirs owned the Schwalge patent in suit at the time that the fraudulent efforts to reinstate the Reclaimo Company were undertaken by Hinkle et al. However, irrespective of the true location of title to the patent at that time, Hinkle et al. and Prelin knew or should have been aware of the infirmities in the title at the time that they bought whatever interest was available in the patent, and surmounting all of these considerations is the fact that Prelin's hands were sullied in the manner in which they set about to acquire the patent with the thought and intention that they would wield the patent to suppress any competitive activity in the future on the part of the Defendants and even on the part of those who, without proof, they suspected might be dealing with the Defendants, or might be inclined to do so.

109. Priest and Starnes, in fact, in pursuing and buying whatever interest Hinkle et al. owned in the Schwalge patent, did so with the purpose and intent of harassing and destroying the Defendants' business at Enid, Oklahoma.

## PATENT INFRINGEMENT

110. During the trial of this case, Prelin asserted that Defendants infringed claims 4 and 5 of the patent-in-suit.

111. Claim 4 of the patent-in-suit specifically calls for, among other things, the bosses on the floor of the evaporation chamber to have concave top faces to serve as oil channels. Claim 5 is dependent on claim 4 and therefore contains the same limitations.

112. The oil channels in the patent in suit are stressed in the patent specification and during the prosecution of the application for the patent as performing the dual functions of exposing the oil therein to heat from a heater thereabove and spreading the oil out to where it flows down all of the inclined surfaces of the bosses in thin films for further exposure to heat.

113. The Defendants' structure, on the other hand, employs only holes extending vertically through the bosses for the passage of oil, and the top faces of Defendants' bosses are flat.

114. Defendants' structure does not have bosses with concave top faces as required by claims 4 and 5 of the patent-in-suit, nor does Defendants' structure include the equivalent of the claimed structure. The holes in Defendants' bosses do not perform substantially the same function and accomplish the same results as the claimed oil channels in the patented structure.

115. The Defendants have not infringed claims 4 and 5 of the patent-in-suit.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and of the subject matter.

2. Defendants have not infringed Schwalge United States Patent 2,839,196.

3. Defendants have not unfairly competed with the Plaintiff, and in all cases, the complained of actions of Defendants have been defensive in character with respect to the unfair competitive acts and destructive intentions of the Plaintiff.

4. Defendants have not been guilty of patent mismarking under Title 35 U.S.C. § 292.

5. The Plaintiff has unfairly competed with the Defendant and has violated all equitable principles;

in the acquisition of the Schwalge patent with the intent to destroy the Defendants and harass Defendants' customers and others who might be thought to be considering dealing with the Defendants;

in misrepresenting ownership of patents when none were owned by Plaintiff nor by any of its officers;

in misrepresenting the exclusive right to distribute the electric oil refiners manufactured and sold to the Plaintiff by the Defendants;

in attempting to prevent all communications between their independent contractor-distributors and the Defendants;

in misrepresenting themselves to be the owners or controllers of the manufacturing facility in Enid, Oklahoma which had been owned and operated by the Defendant George E. Barrow since at least as early as 1964; and

in threatening and harassing the customers of the Defendant and others by asserting against such customers and others, including even some of Plaintiff's own distributors, a patent which Plaintiff had acquired by stealth and with unclean hands, and which Plaintiff knew, or should have known, was derived through antecedents having very questionable title to the patent, and in any event, incomplete and fraudulently obtained title to the patent.

6. The unfair competitive activities of the Plaintiff have been deliberate, intentional, willful and malicious.

7. The Plaintiff is barred by its laches and that of its ostensible predecessors in title from asserting or enforcing Schwalge United States Patent 2,839,196 against the Defendants.

8. The Plaintiff Prelin and its officers engaged in an unlawful scheme involving contracts, combinations and conspiracies to control, monopolize and restrain trade between the several states in the manufacture and distribution of electric oil refiners in violation of the anti-trust laws of the United States and of the State of Oklahoma, and more specifically:

(a) Prelin, through economic and legal sanctions, coerced and forced its distributors to adhere to retail prices at which the electric oil refiners sold by these distributors and purchased from Prelin were sold by the distributors at the retail level, such control and price fixing constituting a violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2);

(b) Prelin instituted and enforced a concerted communications boycott to isolate Defendants from contact and communication, not merely with the independent contractor-distributors

within the Prelin pyramiding system, but with prospects who were distributors of neither Prelin nor Defendants;

■ (c) Prelin has discriminated, without any reasonable basis, in the prices at which it sold electric oil refiners to distributors within its pyramiding system, and in effecting such price discrimination in sales to these distributors in interstate commerce, has violated Section 2 of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. § 13);

■ (d) The Plaintiff, Prelin, has undertaken to suppress competition by asserting, in its contracts with its distributors, the right to insist upon no competition by these distributors for a period of two years after the distributors shall have, for any reason, terminated or been terminated in their distributorship contract with Prelin;

■ (e) The Plaintiff entered into a contract with Universal Products, Inc. by which the parties agreed to control the prices at which the electric oil refiners would be sold by each, and further agreeing that neither would expand or add further distributors without the agreement of the other;

■ (f) The Plaintiff, Prelin, has insisted that all distributors of Prelin refrain from dealing in any electric oil refiner devices which would be competitive with those sold to such distributors by Prelin; and

■ (g) The Plaintiff, Prelin, acquired ostensible title to U.S. Patent 2,-839,196 with the intention, and for the purpose, of, destroying the Defendant and other competition, or potential competition, of Plaintiff, and thereby of acquiring for itself, the entire market for electric oil refiners in the United States, knowing in doing so that it was acquiring a patent of doubtful viability because of numerous clouds on its title. Such acquisition was carried out pursuant to a deliberate plan and purpose of wielding and asserting the patent against the Defendant, against the De-

fendants' customers and distributors, and against any potential customers or distributors of either Defendant or Plaintiff who might choose to deal with or buy electric oil refiners from either. After acquiring the Schwalge patent with unclean hands and unethical intentions, the Plaintiff brought the present suit for the purpose of destroying the Defendants' business, and concurrently, and without waiting for an outcome to the present suit, asserted that patent against all of the Defendants' known jobber-distributors, and even against some of the Plaintiff's own distributors whom the Plaintiff merely suspected of having been in communication with Defendant, and possibly having bought electric oil refiners from the Defendants. This course of conduct clearly violated the provisions of the anti-trust laws of the United States and of the State of Oklahoma: Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2); Section 2 of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. § 13); Section 3 of the Clayton Act (15 U.S.C. § 14); Title 79 of The Oklahoma Statutes, Sections 1 and 2, and such conduct clearly falls within that proscribed, and the principles laid down, by the 10th Circuit Court of Appeals in their decision in Kobe, Inc. v. Dempsey Pump Company, 198 F.2d 416 (CA–10, 1952), for as clearly as could be established by any facts, the facts here prove that the Plaintiff in this case has violated all the rules of equity, and acquired the Schwalge patent as a part of an unlawful and monopolistic scheme which had for its purpose the elimination and prevention of competition.

■ 9 Defendants are entitled to a permanent injunction enjoining further acts of unfair competition on the part of Plaintiff, and a permanent injunction enjoining the Plaintiff, Prelin, from further acts in violation of the anti-trust laws of the United States and the State of Oklahoma, including (a) the assertion of the Schwalge patent against the Defendant, or Defendants' customers, for their manufacture and sale of

the devices which have been made and sold by the Defendants since the outset of the contract with the Plaintiff, (b) representing themselves to be the sole source of electric oil refiners, (c) representing that they own any patents which cover the electric oil refiner which the Defendants have in the past manufactured and sold, (d) representing that they own or control in any way the manufacturing or selling activities of the Defendants, (e) discriminating in the sales price of electric oil refiners between different purchasers of Prelin in violation of Section 2 of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. § 13), (f) combining or conspiring to fix the resale price charged for the electric oil refiners sold by Prelin, and (g) selling electric oil refiners on condition that the purchaser shall not use or deal in the commodities of a competitor, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14). The acts of Prelin are enjoinable under the provisions of Title 15 of the United States Code, Section 26.

10. By reason of the willful and wanton nature of the Plaintiff's conduct, and by reason of the fact that the Plaintiff has continued its unfair competitive acts and violations of the anti-trust laws even beyond the date of the bringing of this suit for the obtainment of redress against the Defendants for their alleged infringement of the patent, the Defendants are entitled to their attorneys' fees and costs in this action. This case is also an exceptional case of the type contemplated by Title 35 United States Code, Section 285 justifying an award to Defendants of reasonable attorney fees.

11. By reason of the clear and unquestionable violation by the Plaintiff of the anti-trust laws of the United States and of the State of Oklahoma as hereinbefore more particularly described, the Defendants are entitled to, and shall receive, treble damages based upon the damage which has been sustained by the Defendants as a result of the inequitable acquisition and assertion of the Schwalge patent against the Defendants and their jobber-distributors, the Plaintiff's price fixing activities, and the Plaintiff's attempts to prevent all competition in competitive products and competitive endeavors by its independent contractor-distributors and to prevent these distributors from communicating with the Defendants. [Title 15 of the United States Code, Section 15; Title 15 of the United States Code, Section 26; Title 79 of the Oklahoma Statutes, Section 25.]

12. Defendants are entitled to their taxable costs, and all cost of this action shall be taxed against the Plaintiff.