HANDGARDS, INC., a corporation,
Plaintiff-Appellee,

v.

ETHICON, INC., a corporation,
Defendant-Appellant.

No. 76–3150.

United States Court of Appeals,
Ninth Circuit.

May 3, 1979.

As Modified on Denial of Rehearing and
Rehearing En Banc July 27, 1979.

David F. Dobbins (argued), New York City, George S. Frazza, New Brunswick, N. J., Robert M. Dunne, Dunne, Phelps, Mills & Burns, San Francisco, Cal., for defendant-appellant.

Maxwell M. Blecher (argued), Blecher, Collins & Hoecker, Joel R. Bennett, Kendrick, Netter, Orr & Bennett, Los Angeles, Cal., Morrison & Foerster, San Francisco, Cal., for plaintiff-appellee.

Before SNEED and KENNEDY, Circuit Judges, and VON DER HEYDT,* District Judge.

SNEED, Circuit Judge.

Ethicon appeals from a judgment rendered after a civil jury trial in which it was found guilty of violating Section 2 of the Sherman Act by monopolizing or attempting to monopolize the market for heat-sealed plastic gloves sold to manufacturers of home hair care coloring kits. Plaintiff-appellee Handgards bases its private antitrust action upon its contention that Ethicon earlier had initiated and pursued a series of patent infringement suits against it in bad faith, or as an integral part of an overall scheme to monopolize. On appeal, Ethicon argues, *inter alia*, that the district court erred in instructing the jury that Ethicon could be found guilty of an antitrust violation upon proof by a mere preponderance of the evidence that it had prosecuted one or more ill-founded patent infringement actions in bad faith and with an intent to monopolize. This court has jurisdiction pursuant to 28 U.S.C. § 1291. Because we conclude that the district court erred in so instructing the jury and because of certain deficiencies with respect to the court's charge regarding damages, we re-

---

* Hon. James A. Von der Heydt, Chief United States District Judge for the District of Alaska, sitting by designation.

verse the judgment entered below and remand the case for a new trial.

## I.

### Factual Background

It is helpful to set forth a brief description of the patent enforcement conduct which forms the basis for Handgards' antitrust complaint before reviewing the history of the instant action.

### A. The Prior Patent Enforcement Conduct.

The plaintiff-appellee Handgards, Inc. is a Nebraska corporation engaged in the business of manufacturing, distributing, and selling disposable plastic gloves adhered to paper. Handgards was formed from the 1966 merger of two constituent disposable plastic glove manufacturers: Plasticsmith, Inc. (Plasticsmith) and Mercury Manufacturing Company (Mercury). The defendant-appellant Ethicon, Inc. is a wholly-owned subsidiary of Johnson & Johnson and is engaged in the business of manufacturing, selling, and distributing surgical supplies. Prior to 1969, Ethicon manufactured, distributed, and sold disposable plastic gloves adhered to paper through its Arbrook division. Ethicon ended its participation in the disposable plastic glove business in 1969, when the assets of its Arbrook division were transferred to another Johnson & Johnson subsidiary named Arbrook, Inc.

In 1961 Ethicon acquired the assets of the Scott Company, which, for several years, had marketed disposable plastic gloves produced in accordance with a process developed by one of its founders, Joe Gerard. In so doing, Ethicon acquired both Gerard's pending application for a patent on his glovemaking process, as well as his glove-making equipment.[1] In 1961 Ethicon also acquired the pending patent application of one Rene Orsini.[2] On April 3, 1962, the Gerard patent covering a glovemaking process issued to Ethicon. On October 20, 1964, the Orsini product patent covering a heat-sealed glove issued to Ethicon.

Both Plasticsmith and Mercury were engaged in the manufacture of heat-sealed disposable plastic gloves at the time the Gerard patent issued in 1962. After several months of unproductive negotiations concerning a licensing agreement for the Gerard patent between Ethicon and T. Hamil Reidy, the chief executive officer and controlling shareholder of Plasticsmith and Mercury, Ethicon filed patent infringement suits in October 1962 against both Plasticsmith and Mercury, alleging infringement of the Gerard patent.[3] In December 1964, after the Orsini patent issued, Ethicon supplemented its patent infringement complaints against Plasticsmith and Mercury by adding a claim that the Orsini patent also was being infringed.

In 1966 Plasticsmith and Mercury were merged into a successor corporation, Handgards, Inc., the plaintiff in this case. Reidy continued as the chief executive officer and controlling shareholder in Handgards. In 1967, after learning that some of the allegedly infringing machines operated by Handgards reportedly were owned by Reidy rather than by Handgards or either of its predecessor corporations, Ethicon filed an infringement action against Reidy individually at his Chicago, Illinois residence. Reidy thereafter voluntarily intervened in the consolidated action then pending in California.

The consolidated patent infringement suit was tried to the court in 1968. Ethicon's trial counsel dropped the claims con-

---

1. Gerard filed the patent application covering his glovemaking process on January 2, 1958.

2. Orsini filed an application for a French patent on September 17, 1956; he filed for a United States patent on September 17, 1957.

3. Ethicon filed suit against Plasticsmith, a Delaware corporation, on October 30, 1962, in Delaware. Ethicon filed suit against Mercury, a Nebraska corporation, on October 31, 1962, in Nebraska. After attorneys for Plasticsmith prevailed on a motion to transfer the Delaware action to the Northern District of California, Ethicon's attorneys consented to the transfer and consolidation of the Mercury action with the Plasticsmith action.

cerning the Orsini patent from the action, reportedly because he thought Orsini to be the weaker of the two patents and because he believed that narrowing the issues before the court would enhance the chance of successfully prosecuting the Gerard patent. On April 25, 1968, the trial judge entered judgment for Handgards, concluding that the Gerard patent was invalid because of the existence of a "prior public use" of the process by Lyle Shabram, one of the founders of Plasticsmith.[4] On appeal, this court affirmed the district court in a brief per curiam decision.[5]

## B. History of the Present Action.

Plaintiff-appellee Handgards filed this civil antitrust action in 1968 seeking to recover treble damages and other equitable relief for the injuries it claimed to its busi-

ness and property by virtue of the alleged antitrust violations committed by defendant-appellant Ethicon and defendant Johnson & Johnson. The gist of the plaintiff's complaint was that the parent-subsidiary defendants had either unilaterally or in concert, monopolized, attempted to monopolize, and conspired to monopolize trade and commerce for the purpose of eliminating plaintiff as a competitor in the sale of disposable plastic gloves to the hair care and medical markets.

Plaintiff altered its primary theory of recovery dramatically during the eight year period between the time it commenced this action and the time of trial in 1976. Handgards' suit began primarily as a *Walker Process* case, i. e., a suit alleging antitrust liability for the enforcement of a fraudulently obtained patent (Orsini).[6] *See Walk-*

---

4. The "prior public use" defense arises under 35 U.S.C. § 102(b), which provides that:

   A person shall be entitled to a patent unless—

   . . . . .

   (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

5. *Ethicon, Inc. v. Handgards, Inc.*, 432 F.2d 438 (9th Cir. 1970), *cert. denied*, 402 U.S. 929, 91 S.Ct. 1525, 28 L.Ed.2d 863, *rehearing denied*, 403 U.S. 912, 91 S.Ct. 2204, 29 L.Ed.2d 690 (1971). The complete text of the court's decision reads as follows:

   Ethicon's Gerard patent No. 3,028,576 was held invalid because the trial court found that under 35 U.S.C. § 102(b) there was prior public use for more than one year of the concept of the machine, the subject of the patent.

   There is little or no direct contradiction in the oral evidence. In our view, we have a case that could have been decided either way. Ethicon contends the testimony of Handgards' principal was too weak and impaired by certain circumstances. But the trial court was entitled to give more weight to other circumstances which point to Handgards' version being correct.

   The decree is affirmed because the findings are not clearly erroneous.

6. *Walker Process* stands for the proposition that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."

382 U.S. at 174, 86 S.Ct. at 349. Mr. Justice Harlan, concurring, stressed that "deliberate fraud" was required and that the Court did not hold

   that private antitrust suits might also reach monopolies practiced under patents that for one reason or another may turn out to be voidable under one or more of the numerous technicalities attending the issuance of a patent [for such a result] might well chill the disclosure of inventions through the obtaining of a patent because of fear of the vexations or punitive consequences of treble-damage suits.

382 U.S. at 180, 86 S.Ct. at 351–352 (Harlan, J., concurring).

   Handgards' original complaint charged the defendants with (i) a violation of section 7 of the Clayton Act, allegedly occurring when Ethicon acquired the assets of the Scott Company in 1961 and (ii) violations of the Sherman Act, allegedly occurring as the result of a fraudulent procurement of the Orsini patent. A supplemental complaint was filed in 1974 which also charged that the defendants had continued to violate the antitrust laws since the date of the original complaint by committing certain illegal acts such as the instigation of baseless lawsuits and pricecutting. Neither complaint charged Ethicon with fraudulent procurement of the Gerard patent. Although plaintiff sought to add such a contention in 1974, the district court had denied leave to amend the complaint. The only allegations in either complaint pertaining to the invalidity of the Gerard patent were that the Gerard patent had been found invalid on the basis of a prior public use and that "[d]uring the pendency of such action, defendants

er Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). This theory ultimately proved not viable.[7] In 1975 Handgards expressly abandoned the *Walker Process* theory at a hearing on a motion for summary judgment and instead asserted the two theories on which this case ultimately was tried: the first was referred to at trial as the "overall scheme" theory; the second was referred to as the "bad faith" theory. The district court's published opinion on the motion for summary judgment reflected the new orientation of plaintiff's case. *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp. 921 (N.D.Cal.1975).

■ Handgards now largely bases its monopolization charge on the various patent infringement and other lawsuits brought on behalf of Ethicon by J & J house patent counsel. The claim is rooted in *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir. 1952), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952), and its progeny—particularly *Mach-Tronics, Incorporated v. Zirpoli*, 316 F.2d 820 (9th Cir. 1963), *Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir. 1975), and *Prelin Industries, Inc. v. G & G Crafts, Inc.*, 357 F.Supp. 52 (W.D. Okl.1972). The Ethicon suits were purportedly brought as integral ingredients of a scheme to monopolize the disposable glove market. . . .

.   .   .   .   .

■ Plaintiff charges that defendants attempted to create a monopoly in the disposable glove industry by accumulating a number of the relevant patents—no matter how weak or narrow—and then instigating a series of lawsuits in order to slowly litigate the competition out of business.

.   .   .   .   .

The bringing of a series of ill-founded patent infringement actions, in bad faith, can constitute an antitrust violation in and of itself *if* such suits are initiated or pursued with an intent to monopolize a particular industry (and, of course, the other elements of a Section 2 violation are present). *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Kellogg Co. v. National Biscuit Co.*, 71 F.2d 662, 666 (2d Cir. 1934); *Bolt Associates, Inc. v. Rix Industries, supra*, [1973–1 Trade Cases, ¶ 74,474 (N.D.Cal. 1973)].

413 F.Supp. at 923–25 (emphasis in original).

The court defined the term "bad faith" in this context as knowing that the particular patent was invalid because (i) Ethicon allegedly knew (through its agent Gerard) of relevant prior art existing more than a year before the filing of the Gerard patent application; (ii) Ethicon allegedly knew (through its agent Gerard) that the invention had been on sale more than a year prior to the filing of the Gerard patent application; or

---

obtained additional information showing and confirming the invalidity of the Gerard patent."

7. In 1971 Ethicon filed a motion for summary judgment, arguing that the undisputed facts precluded a finding that the Orsini product patent had been fraudulently procured under the criteria set out in *Walker Process, supra. See* note 6 *supra*. The district court denied defendant's motion in 1972 pending completion of discovery in the case, but noted that "[a] ruling that no triable issue of fraud in the procurement of the Orsini divisional patent exists would be within . . . [its] sound discretion." Ethicon renewed its motion for summary judgment in 1975, at which time the district court granted the motion in part and denied it in part. *Handgards, Inc. v. Johnson & John-*

*son*, 413 F.Supp. 921 (N.D.Cal.1975). The district court's opinion on the motion for summary judgment noted the death of any *Walker Process* allegations, stating that "Handgards represented at oral argument on the motion and in its post-hearing reply memorandum that it was not proceeding as though this case were governed by *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*," that the "abandonment by plaintiff of its primary theory of recovery based on the Orsini patent is no surprise," that the "Orsini patent infringement suit was not prosecuted in violation of *Walker Process*," and that plaintiff's complaint had never contained a *Walker Process* allegation regarding the Gerard patent. 413 F.Supp. at 923.

(iii) Ethicon allegedly knew that the Orsini patent was invalid because material information had been withheld from the patent examiner.[8]  *Id.* at 925.

At the trial the parties presented dramatically different versions of the facts to the jury.  Plaintiff contended that Ethicon had accumulated the Orsini and Gerard patents, two key patents in the field, intending to monopolize the industry;  that Ethicon had initiated and pursued its patent infringement suits against Handgards and its predecessors in bad faith, i. e., with knowledge that the patents were invalid, for the purpose of monopolizing the market;[9] that even if brought in good faith, Ethicon's infringement suits constituted individual predatory acts in an overall scheme to monopolize;  and that Ethicon had generated adverse publicity regarding its infringement actions, threatening potential customers of the plaintiff, with the result that vital corporate resources were committed to defense of the infringement actions, Handgards' relations with potential customers were impaired, a proposed joint venture was aborted, and the company found itself unable to obtain outside financing necessary for it to remain competitive in the industry.  Defendant Ethicon countered by arguing that it lacked any improper monopolistic motive in its acquisition of the Gerard and Orsini patents;  that it had initiated the various infringement actions in complete good faith, after careful investigation, and with the reasonable expectation of success;  that it did not publicize its infringement actions within the industry;  and that Handgards' competitive problems resulted from its having marketed a lower quality product, provided poorer service, and been unwilling to respond to the competitive demands of the industry.

The jury returned a general verdict in favor of Handgards in the amount of $2,073,000 prior to trebling and gave the following responses to the special interrogatories submitted in the case: (1) the Orsini patent was not invalid on the basis of prior disclosures of another patent; (2) the relevant market in the case consisted of the market of heat-sealed plastic gloves sold to manufacturers of home hair care coloring kits; (3) Ethicon was guilty of monopolizing or attempting to monopolize the relevant market by prosecuting the patent lawsuits against Handgards and its predecessors in bad faith, that is, with actual knowledge that either the Gerard or the Orsini patent was invalid; (4) Ethicon was guilty of monopolizing or attempting to monopolize the relevant market by prosecuting the prior patent action as a predatory act in an overall scheme designed to exclude Handgards from the market;  and (5) & (6) Ethicon and Johnson & Johnson were not guilty of entering into an agreement, combination, or conspiracy to restrain trade or to monopolize the relevant market.

8. In its 1972 decision on defendant's motion for summary judgment, *see* note 7 *supra*, the district court noted that the failure to supply the Patent Office with the information pertaining to the Orsini patent, which already allegedly was part of its files, did not constitute fraud on the Patent Office in the *Walker Process* sense. In its 1975 decision on defendant's motion for summary judgment, the district court formally held that Ethicon's "failure to inform the Patent Office of information in its own files does not amount to the extremely circumscribed 'intentional fraud' necessary to prove an action under *Walker Process.*"  413 F.Supp. at 923.

9. Plaintiffs argued that the Gerard and Orsini patents were known by Ethicon to be invalid because they claimed: (1) a Mr. Babb had testified that Gerard had told him that he knew the Gerard patent was invalid; (2) evidence had been introduced suggesting that Ethicon knew of Shabram's invalidating prior public use; (3) evidence had been introduced suggesting (a) that Ethicon knew that Gerard's invention had been "on sale" more than one year prior to the date of the filing of the patent application within the meaning of 35 U.S.C. § 102(b) and (b) that Ethicon's patent attorneys knowingly falsified an answer to an interrogatory in the prior patent action regarding the "on sale" issue; (4) evidence had been introduced suggesting that Ethicon's patent attorneys knowingly falsified an answer to an interrogatory in the prior patent action concerning the date on which Gerard's invention had been reduced to practice, in an attempt to mislead Handgards' counsel into defending the suit on a more difficult ground; and (5) evidence had been introduced suggesting that Ethicon knew the Orsini patent to have been invalid because of its having been anticipated or made obvious by a prior patent.

Ethicon advances six basic arguments on appeal: (1) the trial court erred in instructing the jury that the bad faith enforcement of a patent can, without more, constitute an exclusionary act for which antitrust liability may result; (2) the finding that Ethicon prosecuted its infringement actions in bad faith is based upon pure speculation; (3) the jury's finding that Ethicon possessed a valid patent (Orsini) which covered the market found to have been monopolized precludes entry of a verdict of illegal monopolization of that market; (4) the trial court erred in permitting the jury to determine the relevant market and instead should have found that the relevant market was broader than the one chosen by the jury; (5) Handgards failed to show any injury resulting from the alleged section 2 violations by Ethicon; and (6) the trial court erred in directing a verdict against Ethicon on its antitrust counterclaim against Handgards. Because we conclude that resolution of appellant's contentions concerning the bad faith theory and the damages recoverable in a case of this sort necessitate reversal and remand for a new trial, we need not, at this time, reach the other issues urged by appellant. All such issues may be presented to the trial court for such reconsideration as it deems proper in the light of this opinion.

## II.

### Antitrust Liability for Patent Enforcement Conduct.

#### A. The Problem.

■ We are confronted in this case with the complex interaction between two conflicting bodies of law: One, the patent law, is concerned with the creation and commercial exploitation of a statutory grant of monopoly power; the other, the antitrust law, is concerned with proscribing various kinds of monopoly power.[10] Reconciling the interrelationship between the patent and antitrust laws has long been a topic of concern to courts as well as to commentators. *See, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975); *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed.2d 651 (1952); P. Areeda & D. Turner, *III Antitrust Law* ¶ 704a, at 114–15 (1978); L. Sullivan, *Handbook of the Law of Antitrust* § 181 (1977); and Stedman, *Patents and Antitrust—The Impact of Varying Legal Doctrines,* 1973 Utah L.Rev. 588. This case presents yet another instance in which the boundaries of the patent-antitrust interface must be determined.

**10.** The power to exclude, which is the essence of every patent, is monopoly power. Hence, "[a]ny action to enforce a patent is in a very explicit sense 'exclusionary,' both in purpose and, if successful, in effect." L. Sullivan, *Handbook of the Law of Antitrust* § 181, at 522 (1977). *See* P. Areeda & D. Turner, *III Antitrust Law* ¶ 704a, at 114–15 (1978). The patent laws contemplate "broad criteria of patentability while lodging in the federal courts final authority to [determine patent validity]," *Blonder-Tongue Laboratories, Inc. v. University Foundation,* 402 U.S. 313, 332, 91 S.Ct. 1434, 1444, 28 L.Ed.2d 788 (1971); patentees invoke that authority by initiating infringement suits to enforce their patents. The antitrust laws on the other hand, proscribe certain types of exclusionary conduct that threaten or create monopoly power, including, in at least some situations, the use of vexatious litigation. *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *on remand,* 360 F.Supp. 451 (D.Minn.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). It therefore is necessary to reach an accommodation between the patent and the antitrust laws whenever antitrust liability is premised on a finding regarding a patentee's intent to monopolize or its exercise of exclusionary power. To determine the existence of section 2 liability properly requires careful distinctions between lawful patent-related exclusionary conduct or intent and unlawful patent-related exclusionary conduct or intent; only unlawful patent-related exclusionary conduct or intent is evidence of an intent to monopolize or the exercise of exclusionary conduct within the meaning attributed to section 2. *See SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983 (D.Conn.1978). The task then, is to "identify the point at which . . . [an attempt to enforce a patent], always exclusionary in . . . [the] literal sense, . . . become[s] so intractable as to warrant its being called exclusionary in the sense relevant to the establishment of a Section 2 violation. . . ." L. Sullivan, *supra,* § 181, at 522.

■ Patentees must be permitted to test the validity of their patents in court through actions against alleged infringers. Their status as alleged possessors of a legal monopoly does not cause them to be pariahs before the law. *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) require no less.[11] On the other hand, infringement actions initiated and conducted in bad faith contribute nothing to the furtherance of the policies of either the patent law or the antitrust law.[12] The district court was correct in holding, in effect, that such actions may constitute an attempt to monopolize violative of Section 2 of the antitrust law.[13] "Bad faith," however, is a subjective state of mind the existence of which, while not susceptible to certain proof, easily can spring from suggestive and weakly corroborative circumstances.

The problem, as we see it, is to provide the means whereby the bad faith infringement action can be identified post hoc with a sufficiently high degree of certainty to make it highly improbable that the action in fact was brought in good faith. The imposition of treble damages, a sanction strongly punitive, *see Walker Process, supra,* 382 U.S. at 180, 86 S.Ct. 347 (Harlan, J., concurring) and P. Areeda & D. Turner, *supra, II Antitrust Law* ¶¶ 311, 331, dictates that such means exist. For reasons which appear below the solution of this problem points the way to the proper disposition of this case.

11. It is worth emphasizing that the absence of an immunity does not create an antitrust offense. The fact that defendant's conduct is not immune from antitrust scrutiny does not satisfy the plaintiff's burden of proving the usual elements of an antitrust offense, including significant harm causally related to the conduct.

P. Areeda & D. Turner, *supra, I Antitrust Law* ¶ 204e2.

See *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *on remand,* 360 F.Supp. 451 (D.Minn.1973), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).

12. Subjecting a potential rival or actual rival to . . . [the burden of defending an infringement suit] may weaken him or even dissuade him from beginning or continuing the rivalry with the monopolist-patentee— and perhaps without regard to the merits of the infringement claim.

P. Areeda & D. Turner, *supra, III Antitrust Law* ¶ 708, at 145. *See generally* L. Sullivan, *supra,* § 181; Stedman, *supra,* at 593–94.

13. An antitrust plaintiff pursuing a bad faith patent prosecution theory must still prove the other requisites of a § 2 offense. In *Walker Process* the Supreme Court emphasized the need to demonstrate the patentee's possession of exclusionary power within the relevant market before antitrust liability would result.

To establish monopolization or attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act [on a *Walker Process* theory], it would . . . be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market there is no way to measure . . . [defendant's] ability to lessen or destroy competition. It may be that the [patented] device . . . does not comprise a relevant market. There may be effective substitutes for the device which do not infringe the patent. This is a matter of proof, as is the amount of damages . . .

382 U.S. at 177–78, 86 S.Ct. at 350–51.

We note the existence of a jury finding in this case that the relevant market consisted of the market of heat-sealed plastic gloves sold to manufacturers of home hair care coloring kits, or the home hair care plastic disposable glove market; a market coterminous with that covered by the Gerard patent. In view of that finding, Ethicon's prosecution of a bad faith infringement action likely would constitute an attempt to monopolize violative of section 2. The requisite intent to monopolize in this case could be inferred from the finding of bad faith. Not all bad faith infringement actions will necessarily constitute attempts to monopolize violative of section 2. Nor will a patentee found guilty of prosecuting an infringement action in bad faith necessarily be guilty of an offense of monopolization. *The imposition of antitrust liability will depend upon plaintiff's proof that the defendant-patentee possessed or threatened to possess an ability to lessen competition in the relevant market.*

## B. The Solution.

Our search for a solution commences by distinguishing the facts of this case from those of the cases on which appellee Handgards primarily relies. First, this is not a *Walker Process* case. *Walker Process* stands for the proposition that "the enforcement of a patent procured by fraud on the Patent Office" may give rise to antitrust liability. *See* notes 6 & 7 *supra*. Plaintiff Handgards does not contend that Ethicon sought to enforce a fraudulently-procured patent. Instead, Handgards asserts that Ethicon prosecuted infringement actions in bad faith, that is, with knowledge that the patents, though lawfully-obtained, were invalid.

■ Second, this is not a *Kobe* case. *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed.2d 651 (1952). In *Kobe* a patentee had engaged in a plan of monopolization by acquiring all present and future patents relevant to an industry, obtaining covenants not to compete from those from whom it purchased the patents, publicizing its infringement suits throughout the industry, and threatening suit against anyone trading with the alleged infringer. *Kobe* and its progeny, among which is *Rex Chainbelt, supra*, hold that a patentee may incur antitrust liability for even the good faith prosecution of a valid patent where it is shown that the infringement suit "was brought in furtherance and as an integral part of a plan to violate the antitrust laws." *Rex Chainbelt, supra*, 512 F.2d 1005–06.[14] Our careful examination of the record in this case reveals that no evidence of any overall scheme to monopolize exists *apart* from allegations that directly relate to the bad faith prosecution charges. The old wine in this case consists of evidence indicating that Ethicon may have brought the infringement actions in bad faith. It is the same old wine when put in a new bottle labelled "overall scheme."[15]

14. The issue in *Rex Chainbelt* was whether Harco could recover attorneys' fees incurred in its successful defense of a patent infringement suit as damages resulting from an antitrust violation by Rex Chainbelt. After studying the *Report of the Attorney General's National Committee to Study the Antitrust Laws* 247–48 (1955) and a line of cases highlighted by *Kobe, supra* and *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872 (2d Cir. 1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972), we concluded that "[t]he mere coincidence of an antitrust violation [an illegal tying arrangement] and a patent infringement suit is not sufficient to entitle Harco to attorney's fees expended in defense of the patent infringement claim absent some showing from which the . . . court can find or infer, that *the patent infringement suit was brought in furtherance and as an integral part of a plan to violate the antitrust laws.*" 512 F.2d at 1005–06 (emphasis added).

15. The district court instructed the jury on both the "bad faith" and "overall scheme" theories, stating that "[the prosecution] of one or more ill-founded patent infringement actions in bad faith . . . constitutes an antitrust violation in and of itself if such suits are initiated or pursued with an intent to monopolize a particular market or industry," Reporter's Transcript at 2134, and that "if . . . the lawsuits instituted by Ethicon against plaintiff were brought or maintained in whole or in part to further a plan or a scheme . . . to monopolize . . . or in furtherance of a conspiracy or combination to monopolize or restrain trade . . . [then] the institution and maintenance of these suits violate the antitrust laws, even though the defendants may actually have believed that the . . . patents were valid, and even though the defendants believed that Handgards had infringed these patents." *Id.* at 2151. The court defined "bad faith" in this context as "knowing either at the time the lawsuit is filed or during its pendency that the particular patent sued upon is invalid." *Id.* at 2134. Proof of bad faith, the court charged, must be shown by a preponderance of the evidence, which it described as proof that the proposition is "more likely true than not true." *Id.* at 2095.

The district court summarized the evidence pertaining to the overall scheme for the jury as follows:

. . . [U]nder the overall scheme theory, the plaintiffs contend that the defendants accumulated numerous patents on plastic gloves to prevent competition; that they threatened to sue manufacturers, or purchasers, of allegedly infringing gloves, and misused the Gerard patent.

To support this claim, the plaintiff introduced Gerard's letter to Sam Porter, claiming that anyone manufacturing gloves on paper was in violation of his patent, and was subject to suit for patent infringement.

The plaintiff also presented the testimony of Mr. Webbe regarding the difficulty that Handgards encountered obtaining financing for its operations.

Finally, this is not an *Otter Tail* case. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359, *on remand*, 360 F.Supp. 451 (D.Minn.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). Handgards has neither pleaded nor proved that Ethicon engaged in a pattern of baseless, repetitive litigation designed to prevent meaningful access to an adjudicatory tribunal. *See generally Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076, 1081 n.4, 1087 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).[16]

Rather, this case involves simply the commencement and maintenance of related infringement actions in what the jury found to be bad faith.

A clash between the policies of patent and antitrust laws also was present in *Walker Process* and *Kobe*. In the former the compromise consisted of erecting high

Mr. Campbell, a past employee of Glore Forgan, also testified that his company would not become involved in underwriting the sale of Handgards' stock, because of the pendency of the infringement suit.

Mr. Webbe also testified as to the reluctance of Sam Porter to enter into a joint venture because of the pending suit. And Porter, similarly, testified regarding his concern over the infringement action.

The defendants presented the following evidence to refute the plaintiff's claim that the patent suits were brought as part of an overall scheme to monopolize.

Messrs. Laff and Neuman both testified that the patent actions were filed against Plasticsmith and Mercury Manufacturing because Ethicon was unsure of the relationship between the two companies.

Mr. Laff explained that Delaware was chosen as the place to sue, because it was more convenient for Ethicon; and that after the court ordered the case transferred to San Francisco, Ethicon did not oppose the consolidation of the lawsuit against Mercury, so the action could be tried as one lawsuit.

Messrs. Laff and Neuman testified that the lawsuit was begun against Mr. Reidy when it was learned that Mr. Reidy paid for some of the accused machines.

The evidence shows Ethicon offered Handgards a license under the Gerard patent prior to the lawsuit.

Mr. Webbe and Mr. Blatz have testified that in their opinion the license offered was not reasonable, and would have put Handgards at a competitive disadvantage.

Messrs. Laff, Neuman, and Schlemmer, testified that the letter from Mr. Gerard to Mr. Porter, dated March 16th, 1965, in which Mr. Gerard enclosed a copy of his patent, did not constitute a misuse of the Gerard patent.

The evidence shows that as of at least the date of that letter, all disposable plastic gloves purchased by hair care kit companies were manufactured under the Gerard process.

Mr. Gerard and Mr. Porter testified that the letter was sent at the specific request of Mr. Porter.

Messrs. Laff, Neuman, and Schlemmer testified that no one except a manufacturer of gloves could have been sued under the Gerard patent, which was the sole object of that letter. *Id.* at 2114–16.

As we indicated in the text, our review of the record convinces us that only the bad faith theory of recovery exists in this case. The evidence of an overall scheme to monopolize the relevant market constitutes substantially the same evidence relied upon to show Ethicon's alleged bad faith prosecution conduct. If this evidence, under the instructions our opinion requires, should fail to support the bad faith theory, it should not be sufficient to support the overall scheme theory. To hold otherwise would undercut the protections we here seek to afford the ordinary patentee. For this reason we are unable to affirm the judgment below on the basis of the jury's finding that an overall scheme existed. It is unnecessary for us to address explicitly the issue whether the trial court erred in charging the jury on two theories. It is enough to point out that if on retrial the evidence remains substantially the same, the charge to the jury should reflect only the bad faith theory. We express no opinion on the type of additional evidence that would require an overall scheme charge. *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed.2d 651 (1952) is the archetype, however.

**16.** Judge Kennedy's opinion, concurring in the result and qualifiedly concurring in the majority's opinion, suggests that defendant Ethicon may have available on remand the "immunity" afforded by *Franchise Realty*. Our opinion treats "infringement actions initiated and conducted in bad faith," established in the manner we require, as violative of Section 2 of the antitrust law. When so established, it would be strange to then hold that nonetheless a *Franchise Realty* immunity might exist. In any event, this is an issue that the present record does not require us to address.

**996**

barriers to success by the antitrust plaintiff. As we noted in *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.*, 450 F.2d 769 (9th Cir. 1971), *cert. denied*, 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972):

> The patent fraud proscribed by *Walker* is extremely circumscribed. In *Walker* the Supreme Court excluded from its definition of fraud "an honest mistake as to the effect of prior installation upon patentability—so-called 'technical fraud.'" *Walker, supra*, [382 U.S.] at 177, 86 S.Ct. 347, 350 [15 L.Ed.2d 247]. Wholly inadvertent errors or honest mistakes which are caused by neither fraudulent intent or design, nor by the patentee's gross negligence, do not constitute fraud under *Walker*. . . . The road to the Patent Office is so tortuous and patent litigation is usually so complex, that "knowing and willful fraud" as the term is used in *Walker* can mean no less than *clear, convincing proof of intentional fraud involving affirmative dishonesty*, "a deliberately planned and carefully executed scheme to defraud * * * the Patent Office." . . . Patent fraud cases prior to *Walker* required a rigorous standard of deceit. . . . *Walker* requires no less.

450 F.2d at 772 (emphasis added) (footnote and citations omitted). *See SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096 at 1103 (9th Cir. 1979).

In overall scheme cases such as *Kobe*, courts require proof of an overall scheme to monopolize independent of the mere commencement of an infringement suit before permitting the imposition of antitrust liability based on patent enforcement conduct. This requirement diminishes the specter of antitrust liability encountered by an ordinary patentee who brings an infringement action. *See* Hibner, *Litigation as an Overt Act—Development and Prognosis*, 46 Antitrust L.J. 718, 720 (1977).

The common thread is that in both *Walker Process* and *Kobe* barriers were erected to prevent frustration of patent law by the long reach of antitrust law. This suggests our proper course. It is to erect such barriers to antitrust suits as are necessary to provide reasonable protection for the honest patentee who brings an infringement action to protect his legal monopoly.

■ A proper barrier is, in our opinion, suggested by *Walker Process*. It is that the jury should be instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence. *See Cataphote Corp., supra*, 450 F.2d at 772; *SSP Agricultural Equipment, supra*. Such an instruction accords the patentee a presumption commensurate with the statutory presumption of patent validity set forth in the patent laws, 35 U.S.C. ¶ 282, which can only be rebutted by a showing of clear and convincing evidence. *See, e.g., Santa Fe-Pomeroy, Inc. v. P & Z Co.*, 569 F.2d 1084, 1091 (9th Cir. 1978); *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 1271 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976).

■ The trial court in this case, however, gave no such instruction. *See* note 15 *supra*. Moreover, it charged that the patentee's subjective bad faith need only be proved by a mere preponderance of the evidence. This constitutes reversible error. The district court charge eliminates a barrier we hold necessary, and were it accepted as proper, "might well chill" legitimate patent enforcement efforts "because of fear of the vexations or punitive consequences of treble-damage suits." *Walker Process, supra*, 382 U.S. at 180, 86 S.Ct. at 352 (Harlan, J., concurring).

The barrier we impose is not one intended to be utilized in antitrust litigation generally. It is fashioned in response to the unique characteristics of proceedings in which the alleged violation of the antitrust law consists solely of one or more infringement actions initiated in bad faith.

### III.

### Damages Recoverable By Victims of Bad Faith Infringement Actions.

■ Difficulty also exists with respect to the trial court's charge to the jury con-

cerning the nature of the injuries for which plaintiff properly may recover damages in an antitrust suit based upon a bad faith prosecution theory. "The Supreme Court has recently ruled that the only damages recoverable in an antitrust suit are those which occur by reason of that which made the defendant's actions unlawful." *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). *Brunswick* states the applicable rule and is the governing authority:

> . . . [For] plaintiffs to recover treble damages . . . they must prove more than injury causally linked to . . . [the antitrust violation]. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. [100] at 125 [89 S.Ct. 1562 at 1577, 23 L.Ed.2d 129].

429 U.S. at 489, 97 S.Ct. at 697–698 (emphasis in original) (footnote omitted).

Plaintiff must show that the injury for which it seeks to recover is "the type the antitrust laws were intended to prevent" and "flows from that which makes defendant's acts unlawful." In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which "flows" from the antitrust wrong. Damages for the loss of profits, however, will not necessarily so flow. We have some doubt, for example, whether plaintiff's damage claim for lost profits allegedly resulting from the entry of an additional competitor into the market during the pendency of the infringement suit is the type of injury for which antitrust recovery is appropriate. "The antitrust laws . . . were

enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick, supra*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Moreover, the jury's finding in this case that Ethicon possessed a valid patent covering the market it was accused of monopolizing also raises doubts concerning whether plaintiff's lost profits "flowed from" the antitrust wrong claimed in this case.

The court's charge concerning the damages available to plaintiff for lost profits is ambiguous. Several times the court stated that plaintiff could only recover for lost profits that it would have earned "but for" the antitrust violation by the defendant. *See* Reporter's Transcript at 2160, 2162. The court also stated however, that plaintiff could recover as damages profits lost as the "proximate result" of the antitrust violation. *Id.* at 2163. The court earlier had defined the term "proximate cause" to mean "an act . . . [that] played a substantial part in bringing about" the injury. *Id.* at 2161. According to *Brunswick*, plaintiff must show more than that it suffered injury causally linked to the antitrust violation; the injury must be shown to have "flowed" from the wrong. To "flow" from the wrong, *Brunswick* suggests, the loss must be "'the type of loss that the claimed violations . . . would be likely to cause.'" 429 U.S. at 489, 97 S.Ct. at 697, quoting from *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). To be one of several causes is not enough. The injury must be of the type likely to be caused by the defendant's bad faith infringement action. On the record before us we are left in doubt whether the *Brunswick* test has been met with respect to plaintiff's claim for lost profits. The failure of the trial court to resolve this doubt specifically constitutes error.

## IV.

### *The Reasonable Balance.*

The additional burdens imposed by our holdings on those who seek an antitrust

recovery against one who has brought a patent infringement action against them achieve what we believe to be a reasonable accommodation of the policies of patent and antitrust law. Patent holders must be cautious in bringing infringement actions and alleged infringers remain equipped with a strong retaliatory weapon available for use against those who sue them in bad faith.[17] We think this represents a reasonable balance.

Accordingly, this case is reversed and remanded to the district court for a new trial in accordance with the views expressed herein.

REVERSED and REMANDED.

Each party to this appeal shall bear its own costs and neither party's costs shall be taxed against the other. Rule 39, F.R.App. P.

On Petition for Rehearing.

KENNEDY, Circuit Judge, concurring:

I concur in the result of Judge Sneed's opinion, and think it inappropriate to address the question whether or not Ethicon could rely on an immunity granted to antitrust defendants under the principles set forth in *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). The matter was not raised by Ethicon at any stage of these proceedings. Since a new trial is required in this case, because of the erroneous jury instructions noted by the majority, the district court in the first instance should determine whether Ethicon may raise the question on retrial.

In *Franchise Realty* we held that an antitrust plaintiff must plead that the litigation or petitions which allegedly caused competitive injury were sham proceedings, the showing required by a line of Supreme Court decisions, *see Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). *Franchise Realty* might be interpreted to require dismissal of antitrust claims unless the plaintiff can show that the defendant's conduct was designed to cause competitive injury by exacting such extraordinary costs that meaningful use of an agency or tribunal was barred, *see* 542 F.2d at 1080–81 & n. 4, and perhaps to require further that the defendant must have engaged in conduct other than instigation and maintenance of the proceedings, *see id. See also Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (N.D.N.Y.1977); *Ernest W. Hahn, Inc. v. Codding*, 423 F.Supp. 913 (N.D.Cal.1976). Whether this is a correct interpretation of *Franchise Realty* or the Sherman Act, *cf.* P. Areeda & D. Turner, *Antitrust Law* § 201–204, 203c n.9 at 44–45 (1978), and whether Ethicon's conduct was actionable under such standards are important questions, but the issues are not presented for consideration here.

The majority opinion seems to suggest that a showing of sham proceedings under *Franchise Realty* is not required where the claimed antitrust injury flows from patent litigation, but it does not indicate the respects in which patent litigation somehow presents a greater threat to interests protected by the Sherman Act than other types

---

**17.** We note that substantial disincentives to instigating ill-founded patent infringement suits that are not actionable under the standard of antitrust liability announced today already exist. For example, the patent laws contain a specific remedy for prosecution in bad faith. 35 U.S.C. § 285; the rule of collateral estoppel announced in *Blonder-Tongue Laboratories, Inc. v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1972) serves to dissuade ill-founded patent infringement suits; and nothing appears to preclude a successful defendant in an infringement action from bringing a common law malicious prosecution claim. Moreover, this opinion does not limit any antitrust liability that a patentee may incur for conduct actionable under an overall scheme or *Walker Process* theory.

of suits governed by *California Motor* and *Franchise Realty*. It is irrelevant that a successful plaintiff in a patent action is enforcing a lawful monopoly. Very costly "sham" unfair competition or tort suits, for example, may produce more anticompetitive injury than less costly but successful infringement actions. Moreover, it is difficult to argue that a successful plaintiff has engaged in sham litigation. But to the extent that the patent plaintiff is unsuccessful, I see little reason to distinguish patent litigation from other kinds of litigation. If attempted enforcement of a patent known to be invalid is the special circumstance which justifies a special rule, the court's opinion states no reason to depart from the requirement that a plaintiff prove knowing, intentional fraudulent procurement as stated in *Walker Process*. To the extent that abuse of the judicial process by bad faith prosecution of a claim known to be without merit is the essence of the antitrust violation, the court's opinion states no reason for departing from the circuit's precedents, see *Franchise Realty*, governing this type of antitrust violation. Further, a more lenient rule for patent litigation appears at odds with the principal holding that a special burden of proof is required before an antitrust plaintiff may prevail on the claim of injury from a previous patent litigation, our purpose being to avoid undue discouragement to the adjudication of patent infringement claims. In my view, however, whether and why the kind of antitrust litigation permitted in *Walker Process* is distinguishable in meaningful ways from that discussed in *California Motor*, the relationship between the different standards applied in those cases, and the applicability of *Franchise Realty* to this case, are best left for a later decision when the point has been specifically raised by the parties.[1]

Finally, the majority states that in proving injury "flowing from" an antitrust violation, "To be one of several causes is not enough." To the extent this language suggests a change in the normal standards regarding causation in antitrust cases, the statement is unexplained. There is no need in this case to reexamine the rule that "proximate cause" in antitrust cases is defined in terms of "a substantial cause." See *Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1075 n.3 (9th Cir. 1970); *Hecht v. Pro-Football, Inc.*, D.C.Cir., 187 U.S.App.D.C. 73, 570 F.2d 982, 996 (1977); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970); E. Devitt & C. Blackmar, Federal Jury Practice and Instructions §§ 90.31, 80.18 (1977) ("proximate cause" in antitrust cases defined in terms of "substantial factor"). To the extent the language applies only to antitrust claims based on prior patent infringement actions, the majority similarly does not explain why a different causation rule is appropriate in this kind of case. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), is squarely in point for our holding that the injury must result from a competitive wrong prohibited by the antitrust laws, but in my view it should not be interpreted to introduce a new standard for proving causation either in antitrust cases generally or antitrust claims based on prior patent litigation. I am not as sure as Judge Sneed that part of Handgards' damages claim was for lost profits resulting from the entry of an additional competitor, but I agree that the effect of the Orsini patent on plaintiff's claim of injury creates an issue which the district court should decide.

1. Defendant's position on this appeal was that antitrust claims based on the prior bringing of infringement actions differ from other kinds of antitrust suits based on alleged abuse of the judicial system. It expressly declined to rely on *California Motor*, stating in its brief: "The only relevance of *California Motor Transport*, which had nothing to do with patents, is its explicit reaffirmation by the Supreme Court of *Walker Process* as the applicable standard of fraud in connection with a § 2 case charging enforcement of invalid patents." Appellant's Brief at 27. Instead, defendants argued that this case was governed by *Walker Process*. They claimed plaintiff should have been required to prove common law intentional fraud, not merely bad faith, and that the standard of proof should have been clear and convincing instead of a preponderance of the evidence. Their second argument is adopted in Judge Sneed's opinion.

With the above observations, I concur in the opinion of the majority.