**CONCEPTUAL ENGINEERING
ASSOCIATES, INC.**

v.

**AELECTRONIC BONDING, INC.,
Assembly Systems, Inc., Denise
Lajoie and Joel Mallett.**

Civ. A. No. 84–0054 P.

United States District Court,
D. Rhode Island.

June 8, 1989.

---

**1264**

Maurice Gauthier, Samuels, Gauthier, Stevens & Kehoe, Boston, Mass., for plaintiff.

Jack R. Pirozzolo, Richard E. Bennett, Willcox, Pirozzolo & McCarthy, Boston, Mass., for defendants.

## OPINION

PETTINE, Senior District Judge.

This is an action for damages arising out of a patent suit, which resolved the validity of a United States Patent covering an automatic fusion welding apparatus used in the jewelry business. The defendants allege violation of the Sherman Act, unfair and deceptive acts and practices, unfair competition, and violation of Massachusetts General Laws Chapter 93A; in addition the defendants seek attorneys fees.[1]

In the original suit the plaintiff sued the defendants for infringement; in turn, the defendants counterclaimed for a declaratory judgment which would rule that the patent was invalid for failure to name the defendant, Joel Mallett, as a co-inventor. A trial followed, and on January 6, 1986 I declared that the patent was invalid for the reason alleged by the defendants.

The defendants now argue that the plaintiff used the invalid patent to preserve a monopoly position in Rhode Island and southeastern Massachusetts; specifically, they seek a money award for lost sales on automatic fusion welders and for damage to their reputations which impaired their credibility in the jewelry industry.

For the reasons which follow, I find for the defendants.

There is no need to delve into the facts of the original case; however, I will, as a starting point, reiterate that the idea of developing automatic fusion welders originated with the defendant Joel Mallett; in 1976 he, together with defendant Lajoie, President of Assembly Systems, Inc. (A.S.I.), met with Carl Brastow, President of Conceptual Engineering Associates, Inc. (Conceptual). Mallett and Brastow entered into an arrangement whereby they were to develop a particular kind of automatic fusion welder. Prior to this time, the industry relied on manual welders; these have since been replaced by the automatic welder which has tripled productivity (Tr. Vol. I, p. 21; Vol. II, p. 64; Vol. I, p. 23).[2] The experiment was successful; in 1978 they were able to and did market their product. Under a partnership arrangement, which they then created, Conceptual was the sole manufacturer for A.S.I.; the welder would carry only an A.S.I. label, *i.e.* Conceptual's name was not to appear. A.S.I. was to be the sole distributor.

The market for these machines was concentrated in Attleboro, Massachusetts,

1. The parties in this case are Conceptual Engineering Associates, Inc., owned by Carl Brastow; Aelectronic Bonding, Inc. a corporation, formed in 1983 by defendant Mallett and one Robert Messerlian; Assembly Systems, Inc., a

sales and distribution corporation for the fusion welders, owned by Denise Lajoie.

2. References are made to the transcript for the convenience of the parties.

Rhode Island, and in parts of New York and New Jersey. Prior to this whole controversy, Mallett worked these areas for his own business and, as a consequence, knew 95% of the users of welders. Up to 1982 the partnership arrangement monopolized 100% of the market; but in the latter part of 1981, Conceptual began to diversify its sales of automatic fusion welders through a number of other distributors and/or representatives; it changed the color of the machines from green to black, the pricing structure and, in addition, became more restrictive in its business dealings with A.S.I. As might be expected, this led to the termination of the partnership and the institution of state law suits.

In October or November of 1983, the defendants, together with Robert Messerlian, incorporated Aelectronic Bonding, Inc. (A.B.I.) to manufacture, among other things, automatic fusion welders. Under this arrangement, the first model was completed in January of 1984; A.B.I. then entered into an exclusive Rhode Island and Attleboro distribution arrangement with A.S.I., and announced this set up to the jewelry industry. Immediately following the announcement, the defendants were sued by Conceptual for infringing Conceptual's patent on automatic fusion welders, a patent the existence of which was not known to Mallett. In spite of the patent, defendants continued to offer their product for sale, advertising its availability and attending jewelry shows. These activities were not well received by Brastow; he launched a campaign to undermine the defendants. He not only instituted the patent infringement lawsuit but also placed ads in local newspapers and magazines, announcing that the lawsuit was commenced to defend its, i.e. Conceptual's, rights as the owner of the automatic fusion welder. He coupled the ads with a warning that any person who infringed Conceptual's patent, or aided in the infringement, by selling, buying, leasing or using an infringing automatic welder, without authority from Conceptual, might be held liable for damages.[3]

As was obvious in the trial and pre-trial proceedings, the parties harbor bitter and hostile feelings toward each other; charges abound. Defendants allege they have been slandered and libeled in the industry by Brastow's malicious and false defamatory remarks. These remarks included an accusation that Mallett broke and entered Conceptual's office and stole records, and Brastow calling Mallett a crook, an underhanded person, a cheat, and a person of bad character. In addition to these allegations, it is undeniable that copies of the ads were carried in the Providence Journal, the only statewide newspaper in Rhode Island, and were distributed by Brastow's agents, at the New York jewelry show.[4] Directly attributable to these tactics was the cancellation of twenty to thirty pending sales which had been negotiated by the defendants.

Between 1977 and 1983, the Conceptual fusion welders, under whatever name they were sold, accounted for virtually 100% of the market (Tr. Vol. I, p. 22, 23; Vol. II, pp. 68–72). In 1984, A.B.I. and another company, Fuzit, entered the automatic fusion welder market.[5] After two years Fuzit dropped out of the market, leaving only A.B.I. as a competitor to Conceptual.

Total sales of automatic fusion welders from 1977 through 1986, as reflected in Exhibit 2–o, were as follows:

| YEAR | A.S.I. | CONCEPTUAL | A.B.I. | FUZIT | TOTAL SALES ANNUAL |
|------|--------|------------|--------|-------|--------------------|
| 1977 | 6 (a   |            |        |       | 6 |
| 1978 | 39 (a  |            |        |       | 39 |

3. Attached is a photo-copy of the advertisements.

4. This Court notes, and it will discuss *infra,* that whether or not it was improper to run the ads depends on whether or not there was a sincere belief in the bona fides of the patent suit.

5. A third company may also have begun to sell automatic fusion welders around this time, but there is no evidence that this company was active in the relevant market.

| YEAR | A.S.I. | CONCEPTUAL | A.B.I. | FUZIT | TOTAL SALES ANNUAL |
|------|--------|------------|--------|-------|--------------------|
| 1979 | 10 [a] |            |        |       | 10 |
| 1980 | 11 [a] |            |        |       | 11 |
| 1981 | 6 [a]  | 3 [b]      |        |       | 9  |
| 1982 | 6 [a]  | 6 [b]      |        |       | 12 |
| 1983 | 10 [a] | 33 [b]     |        |       | 43 |
| 1984 | 20 [c] | 17 [b]     | 8 [d]  | 15    | 60 |
| 1985 | 2 [c]  | 20 [b]     | 68 [d] | 15    | 105 |
| 1986 |        | 7 [b]      | 35 [d] |       | 42 |

a) Welders made by Conceptual and sold by A.S.I.
b) Welders made by Conceptual and sold by Conceptual
c) Welders made by A.B.I. and sold by A.S.I.
d) Welders made by A.B.I. and sold by A.B.I.

Following my opinion in January 1986, Conceptual's sales dropped to one fifth that of A.B.I., to total sales of seven machines in 1986, despite its selling price reduction from $10,000 to approximately $7,000 per machine (Tr. Vol. III, p. 115).

### Sherman Act Violation

The Sherman Act provides for both criminal (15 U.S.C. Sec. 2) and civil (15 U.S.C. Sec. 15) penalties. The latter section reads as follows:

... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee....

15 U.S.C. Section 15(a).

■ The criteria to be satisfied for establishing a Sherman Act Violation in this civil suit are:

1. Clear and convincing evidence of bad faith prosecution of the patent suit;

2. Specific intent to monopolize the relevant market;

3. Dangerous probability of success within the relevant market; and

4. Antitrust damages clearly attributable to the patentee's actions.

In the context of the evidence, I will now discuss each standard.

### A. Bad faith prosecution of the patent case

The applicable measure of proof is the very high standard of "clear and convincing evidence". The language in *Loctite Corp. v. Ultraseal, Ltd,* 781 F.2d 861, 876 (Fed.Cir.1985), is so instructive as to this standard for proving bad faith, it prompts me to quote rather extensively:

Clear and Convincing Standard of Proving Bad Faith

Following *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 202 U.S.P.Q. 342 (9th Cir.1979), *cert denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980), the district court required Ultraseal to prove by clear and convincing evidence that Loctite brought its infringement suit in bad faith. Ultraseal contests that standard, urging us to accept the standard used in proving other elements of a civil antitrust cause of action—preponderance of the evidence. We decline to do so, and more importantly, we believe the Court of Appeals for the Seventh Circuit would decline to do so.

*Handgards* involved allegations that a patentee prosecuted an infringement action knowing the patent was invalid. It stated:

"Patentees must be permitted to test the validity of their patents in court through actions against alleged infringers ... On the other hand, infringement actions initiated and conducted in bad faith contribute nothing to the furtherance of the policies of either the patent law or the antitrust law. 601 F.2d at 993, 202 U.S.P.Q. at 348." The problem

recognized by *Handgards* "is to provide the means whereby the bad faith infringement action can be identified post hoc with a sufficiently high degree of certainty to make it highly improbable that the action in fact was brought in good faith." 601 F.2d at 933, 202 U.S.P.Q. at 348. Imposing treble damages under the antitrust laws, "a sanction strongly punitive ... dictates that such means exist." *Id.*

*Handgards* sought a solution to the problem. The court cited *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), as requiring a "clear and convincing" standard for the type of conduct involved there, fraudulent procurement of a patent as a basis for an antitrust claim. 601 F.2d at 996, 202 U.S.P.Q. at 351. The *Handgards* court saw in that standard a barrier "to prevent frustration of patent laws by the long reach of antitrust laws," which "suggests our proper course," *i.e.*, "to erect such barriers to antitrust suits as are necessary to provide reasonable protection for the honest patentee who brings an infringement action" to protect his patent. The barrier identified by *Handgards* is "that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Id.* *Handgards* specifically rejected a "preponderance standard" because that "would eliminate a barrier we hold necessary, and were it accepted as proper 'might well chill' legitimate patent enforcement efforts 'because of fear of the vexatious or punitive consequences of treble damage suits.'" *Id.*

■ With this standard in mind, I further note that bad faith prosecution of a patent suit can be shown by showing clear and convincing evidence of either:

1) having obtained a patent by knowingly and willfully misrepresenting facts to the Patent Office, commonly referred to as a Walker Process–Type Case (*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)),

2) having maintained or enforced a patent with knowledge of its invalidity, commonly referred to as a Handgards–Type Case (*Handgards, Inc. v. Ethicon, Inc.*, *supra*).

If clear and convincing evidence of either one of the foregoing is shown, and the other elements necessary for a Sherman Act violation are present, then liability will attach.

■ In this case, I previously found Brastow's patent invalid for failure to list Mallett as a co-inventor, a finding upheld on appeal. Further, having found that Brastow knew he had a co-inventor, it follows that he knew at the time he attempted to enforce his patent that his patent was invalid for failure to disclose the existence of his co-inventor to the patent examiner. No more facts than these are needed to establish clear and convincing evidence of Brastow's bad faith prosecution of his patent infringement suit against the very individual who was his co-inventor and against his co-inventor's business associates. Having thus maintained and enforced his patent with knowledge of its invalidity, Brastow's conduct clearly satisfies the first criteria for establishing a Sherman Act violation under the *Handgards* line of cases.[6]

---

**6.** Defendants make much in their submissions to this Court of certain newly discovered facts that they contend establish that Brastow practiced fraud before the Patent Office in obtaining his patent. Such facts, if true, would bring this action for damages within the ambit of the Walker–Process Type Case. Because, however, I specifically stated at page 10 of my opinion of January 28, 1986, that "in light of the evidence, the defendant has not sustained the burden of proving inequitable conduct ..." and because defendants failed to file a timely cross-appeal from this decision, this decision has become

"the law of the case" and can be reopened only upon a clear showing of "exceptional circumstances." *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 668 (5th Cir.1983) ("The rule is well established ... that without the filing of a cross-appeal, an appellee 'may not attack the [district court] decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.'") *See also United States v. Turtle Mountain Band of Chippewa Indians*, 612 F.2d

B. *Specific Intent to Monopolize the Relevant Market*

This second criterion raises the issue of whether plaintiff intended to monopolize the relevant market. The third criterion then requires that the Court evaluate the probability of success of plaintiff's attempt to monopolize. Before I can evaluate the evidence offered to satisfy these criteria, however, I must determine what the relevant market is in this litigation.

█ The parties are not at odds as to what constituted the relevant market in this case. The plaintiff does not challenge the definition as set forth by the defendants in their brief at page 31. It is correct, and so I adopt the same and quote:

The relevant market is the area of effective competition. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523 [8 L.Ed.2d 510] (1962). It is " 'the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.' Sullivan, Antitrust 41 (1977)." *Home Placement Service, Inc. v. Providence Journal Co.,* 682 F.2d 274, 280 (1st Cir. 1982), *cert. denied,* 460 U.S. 1028 [, 103 S.Ct. 1279, 75 L.Ed.2d 500] (1983). The relevant market includes both a product and a geographic component. *Brown Shoe, supra.* Within a broad market, economically significant sub-markets may exist which, in themselves, constitute relevant markets for antitrust purposes. *Id.* The purpose of market definitions is not to frustrate antitrust plaintiffs by requiring the proof of bright lines which do not exist, but is to help identify monopoly power, that is, " 'the power to control prices or exclude competition.' [citation omitted]" *Home Placement, supra.*

Defendants established that the relevant product is automatic fusion welders and that the relevant geographic area is Rhode Island and southeastern Massachusetts (*i.e.,* Bristol, Norfolk, Plymouth and Barnstable Counties), the area where the jewelry industry, the users of the automatic fusion welders, are concentrated. *See* Tr. Vol. I, p. 21, 29–31; Vol. II, pp. 57, 63. Conceptual's ability to charge prices at substantial profits and the absence of other sellers further evidences this market.

█ Having now established what the relevant market is in this case, I will consider the issue of plaintiff's specific intent to monopolize the relevant market.

In monopolization cases, the evidence of intent is relevant to "the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anti-competitive' ... or 'predatory'—to use a word that scholars seem to favor. Whichever label is used, there is agreement on the proposition that 'no monopolist monopolizes unconscious of what he is doing.' [citation omitted] ... '[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended.' " *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985).

The First Circuit teaches that, "a method, a means is 'improper' if it is exclusionary." *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983).

To decide whether ... conduct was exclusionary, we should ask whether its dealings went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill, and "unnecessarily excluded competition" from the market. *Greyhound Computer Corp. v. International Business Machines*

517, 519–22 (Ct.Cl.1979); *Gindes v. United States,* 740 F.2d 947, 949–50 (Fed.Cir.1984). Having found that liability attaches on the basis of the facts as originally found in this case, I see no reason to reopen the settled question of whether plaintiff practiced fraud before the Patent Office. The only difference to defendants of allowing recovery under *Walker* rather than under *Handgards* would be in the method of computing damages. Under *Walker,* damages would be computed from the first day of misuse of the patent. Under *Handgards,* damages commence from the date of the institution of the litigation. However, defendants only seek damages for the litigation period, as provided for under *Handgards.* Thus this Court's finding of liability under *Handgards* provides defendants with all the relief they seek.

*Corp.*, 559 F.2d 488, 498 (9th Cir.1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). Professors Areeda and Turner have put the matter nicely: " 'Exclusionary' conduct is conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." 3 P. Areeda and D. Turner, Antitrust Law, Para. 626 at 83 (1978). Was [the] conduct reasonable in light of its business needs or did it unreasonably restrict competition? *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735–36 (9th Cir.1979).

*Id.* at 230. The evidence of plaintiff's intent to monopolize the relevant market is overwhelming. The plaintiff launched industrial warfare, with little regard for the rules of the game. 35 U.S.C. Section 271 does provide that a patent owner, entitled to relief for infringement or contributory infringement, has the right to enforce his patent but, as the plaintiff's counsel recognizes, decisional law, *Handgards, supra,* and the foregoing statute, do not condone bad faith conduct. This Court has no argument with plaintiff's assertion that, "[T]o amount to an antitrust violation or patent misuse, such attempted enforcement [of a patent] must be in bad faith ... Moreover, infringement suites are presumed to be in good faith, a presumption which can be rebutted only by clear and convincing evidence." But even using the principles suggested by plaintiff, I find that the evidence convincingly establishes plaintiff's bad faith. The very target of his exclusionary conduct was the co-inventor of the coveted machine ... and who knew better than Brastow that Mallett was the co-inventor!

The plaintiff argues that case law is clear that a patent owner may notify the trade about his patent rights, if he acts in good faith; he cites in support *Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155–56 (7th Cir.1976) and *Abcor, Inc. v. Romicon, Inc.*, 212 U.S.P.Q. 679, 680 (D.Mass.1980). This Court does not quarrel with such authority. Indeed, it supports my position, because I find that the defendant acted in *bad* faith. As I stated, he certainly knew defendant Mallett was a co-inventor; he not only concealed Mallett's interest in the patent but then attempted to drive him out of the business entirely. The ads, reproduced in the margin hereof, *supra,* were particularly nasty, and went beyond legitimate, vigorous, competitive advertising. Furthermore, it cannot be denied that the assertions in the ads were false innuendos that the plaintiff would sue any person who used or bought the defendant's welder. As established at trial, Brastow never intended to assert the right to sue and, if successful, reap the benefits of victory or, if unsuccessful, suffer possible countersuits and the pain of defeat. Instead it is true as the defendant states, "Brastow, even though he already had decided that, 'I would not sue anyone who bought' a machine from A.B.I. because 'It would not be worth it' (Tr. Vol. II. p. 21) nevertheless mounted a campaign aimed at threatening customers." These advertisements were unmistakably threats, strategically placed in the state's dominant newspaper and, in addition, passed out as handbills at trade shows. The ultimate design of such conduct was to injure Mallett's business and reputation, branding him as an "infringer" and "fly by night" operator.

Even if a damaging publication is prima facie privileged and not actionable although untrue, the privilege may be lost by unnecessary publicity, *Galvin v. New York, N.H. & H.R. Co.*, Mass.1960, [341 Mass. 293,] 168 N.E.2d 262, or by the inclusion of statements known to be untrue or made without reason to believe they were true, *Sheehan v. Tobin*, 1950, 326 Mass. 185, 192–94, 93 N.E.2d 524.

*Donovan v. Wilson Sporting Goods Co.*, 285 F.2d 714, 717 (1st Cir.1961).

I find the articles were widely published and disseminated at the trade shows for "the deliberate purpose of injuring the [defendant's] sales.... [The articles] were couched in such phrases that they naturally would disturb and alarm." *See Aronson v.*

*Orlov*, 228 Mass. 1, 116 N.E. 951; be it an old case, it is still viable.

Defendants have proven a course of conduct by plaintiff which unquestionably demonstrates that plaintiff intended to monopolize the relevant market.

C. *Dangerous Probability of Success within the Relevant Market*

■ To be of any legal import, the intent to monopolize the relevant market, as found above, must be accompanied by the capacity to so monopolize.

The defendants correctly point out, and the plaintiff does not disagree, that the "dangerous probability" of successful monopolization must be determined as of the time the acts occurred. *Multiflex, Inc. v. Samuel Moore Co.*, 709 F.2d 980, 992 (5th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

The terse and all encompassing statement in *Kearney–Treker Corp. v. Geddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir.1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), is a precise directive on this element:

> [We] do not understand the "dangerous probability" test to involve an evaluation of the actual likelihood that an attempt would have succeeded if not frustrated by an intervening event. Rather, it requires an appraisal of the alleged offender's ability to achieve the forbidden result, his intent, and the nature of his overt actions. In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market.

On the facts presented in this case, I find that there was a dangerous probability that plaintiff would succeed in monopolizing the relevant market. Plaintiff was the only manufacturer of the automatic welders in the years 1977 through 1984. *See* chart of total sales, page 1265, *supra*. There is no doubt that plaintiff had the predominant share of the relevant market in 1983, when it *manufactured* all 43 of the automatic welders sold in the relevant market, and

itself *sold* 33 of those 43 machines. It has been held that an 87% share of the relevant market "leaves no doubt" of monopoly power. *C.V.D., Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir.1985). It has also been held that in patent cases, as this one, ownership of a patent has been held to establish at least prima facie evidence of market control. *Kearney & Treker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365 (6th Cir.1977). This Court has no difficulty recognizing that the plaintiff had substantial market control and there was a dangerous probability that plaintiff would succeed in monopolizing the relevant market.

In sum, then, I find that the evidence is clear and convincing that the plaintiff brought the patent suit in bad faith, knowing that the patent was invalid because he had concealed the fact that there was a co-inventor; that the plaintiff intended to monopolize the relevant market, and pursued a campaign to do just that, as evidenced by the advertisements; and that the attempt to monopolize the market had a dangerous probability of success. Therefore, I find that the plaintiff has violated the Sherman Act.

D. *Antitrust Damages Clearly Attributable to the Patentee's Actions*

The antitrust damages clearly attributable to the patentee's, i.e. plaintiff's, anticompetitive actions, and the defendants' claim under Massachusetts General Laws Chapter 93A, remain to be resolved.

■ The plaintiff is correct in saying that the "[d]efendants' antitrust counterclaim is premised on the assumption that 'automatic' fusion welders constitute the entire relevant market in which to measure the degree of probability that plaintiff could achieve illegal market control." The plaintiff contends that the defendants "have offered *no evidence* to contradict plaintiff's contention that the relevant market is fusion welders, including *both* manual and automatic welders. The plaintiff argues that both the automatic and manual welders are "reasonably interchangeable" and since there was a market alternative that buyers could readily use, illegal mo-

nopoly did not exist; in support, plaintiff cites the following language from *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 380 and 393, 76 S.Ct. 994, 998 and 1006, 100 L.Ed. 1264 (1956):

> Every manufacturer is the sole producer of the particular commodity it makes but its control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers: *i.e.*, whether there is a cross-elasticity of demand between cellophane and the other wrappings. This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities.

> \* \* \* \* \* \*

> Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.

The plaintiff emphasizes that the testimony shows that automatic fusion welder did *not* "immediately render the traditional manual fusion welder obsolete". The plaintiff states, "for many years, many jewelry manufacturers hesitated to switch over to automatic welders—not because of plaintiff's patent or threats of infringement suits, but rather because of the cost, reliability problems and servicing demands of the new equipment." (Phase Two Post-Trial Brief at p. 33)

The foregoing points have been well argued by the plaintiff; however, I am not persuaded. The testimony, in the main, comes from the interested parties, and, with the animosity and animus which exists between these litigants, the purity of the testimony may be questioned. Be that as it may, it seems to me that the evidence quite clearly established that the jewelry industry considered the automatic fusion welder the better "mouse trap", and immediately gravitated to its use; obsolescence attached to manual welders, and, though they continued to exist, they generated only a handful of sales—the swing of the market pendulum went to the automatic. Defendant Mallett so testified and, conceding his interest, I believe him. What he said makes sense and is logical. His testimony was, "in product form from 1975—1976 it was principally from manual fusion welders ... and in 1977, late, early 1980 —'78 we began to automate those, a new design fusion welder which in turn, to the present time, has taken most of the market away from manual, thereby replacing the manual welder with the new automatic" (Tr. Vol. I, p. 21). The sales made were of automatic fusion welders; the fact that manual welders existed and some few manufacturers continued to use them is of no significance. I find no evidence to contradict this; the record, as I see it, is barren of any factual assertions that the manual welders competed with the automatic fusion welder. Mallett, not Brastow, knew the market; indeed, Mallett was personally, intimately familiar with the market and, in the main, knew the users. My view of the evidence does not support any conclusion of fungibility—I agree with the defendant that the profit margins belie such a conclusion.

Having disposed of the liability question on antitrust grounds I need not reach the defendants' claims pursuant to Massachusetts General Laws 93A.

### *Calculation of Damages*

A. *Items Compensable in Sherman Act Litigation*

1. Attorney's Fees.

Legal expenses incurred in resolving bad faith claims have been upheld as a proper element of antitrust damages. This is well established and need not be further expounded here. *C.V.D., Inc. v. Raytheon Co.*, 769 F.2d 842, 858 (1st Cir.1985); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1295–97 (9th Cir.1984) ("Handgards II").

2. Other Damages Flowing from Anti-Competitive Acts.

As to other damages, mere injury causally related to an antitrust violation

does not, as a general rule, give rise to damages. Instead a Sherman Act claimant must prove that its injury flowed from anti-competitive acts:

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." *Zenith Radio·Corp. v. Hazeltine Research,* 395 U.S. [100] at 125, 89 S.Ct. [1562] at 1577 [, 23 L.Ed.2d 129].

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977) (emphasis in original) (footnote omitted)[7]. *See also Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 12 (1st Cir.1979), *cert denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980); *C.V.D., Inc.,* 769 F.2d at 858.

As the plaintiff cites in his brief, *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), and *Handgards II,* 743 F.2d at 1295–97, noted that the following factors should be considered in determining whether an anti-trust plaintiff has proven damages caused by defendants' illegal acts: "(1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recoveries or complex damage apportionment."

I find that all these elements have been satisfied. I will supplement what has already been said above only by commenting briefly on Conceptual's argument that the

defendants' case is bottomed on the testimony of interested witnesses. The detached, disinterested witness, is of course, the ideal but that is not to say that the testimony of an interested witness cannot prove a case. In the instant action, the entire controversy is constructed of partisan evidence, produced by both sides. Little, if anything, was offered against which such testimony could be juxtaposed. At the same time, no testimony was offered refuting defendants' computations of damages. Accordingly, I assess the damages in the case as follows:

### B. *Damages to A.B.I.*

#### 1. Attorney's Fees and Costs of Defending Suit.

A.B.I. claims that it incurred costs of $92,967.52 in attorney's fees plus $17,-915 for expert witnesses, travel costs, and the like, for a total of $110,882.52. No testimony was proffered by the plaintiff attacking the defendants' mathematical computation as to attorney's fees and costs; as a consequence I have no reason to dispute the defendants' claim which, in my opinion, is reasonable and fair. I allow this claim.

#### 2. Capital Value Loss.

However, A.B.I. also seeks an additional $29,318.62 as an "adjustment for present value (as of the time of trial) to reflect capital value loss". Authority has been cited to me which mandates the payment of the "capital value loss" only where a prevailing party is entitled to interest on the judgment that he is awarded. I reserve to the defendant the right to further argue this point.

#### 3. Lost Profits on Sales.

Mr. Mallett testified that A.B.I. lost approximately twenty sales (Tr.Vol. I, pp. 42–43, 58, 83). In fact, he stated, the lost sales could be estimated to be as many as twenty-five to thirty-five sales.

---

**7.** The cited case and those that follow speak in terms of damages due to a Sherman Act plaintiff and arising from a defendant's unlawful acts. In applying the quoted materials to the

case at bar, bear in mind that I am here awarding damages to defendants on their counterclaim.

The plaintiff's response is that, "inference of lost sales, in the absence of requisite proof, is ... not appropriate in a multi-supplier market." *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir.1983). I will not dispute the plaintiff's citation of authority. However, here the testimony was not inferential. Mallet spoke of personal knowledge by way of his contacts with customers (Tr. Vol. I, p. 84).

The parties stipulated that the profit lost to A.B.I. on each lost sale was $4,280; it follows, therefore, that A.B.I. lost in profits the sum of $85,600.

#### 4. Total Damages.

The total damages hereby awarded to A.B.I. is $196,482.52.

### C. *Damages to A.S.I.*

#### 1. Lost Profits on Sales.

■ Defendant Lajoie testified, and it is not disputed, that A.S.I. made a profit of $2,000 on each machine which it sold. She further testified that, as a result of Conceptual's conduct, A.S.I. lost twenty-five to thirty-five sales. This figure was determined by direct customer contact and is approximately equal to Conceptual's direct sales made in violation of its agreement to sell through A.S.I.. On the basis of a median figure of thirty lost sales, A.S.I.'s damages would be $60,000 for lost sales. I reject this item of damages and instead allow $22,000 for the reasons which follow.

I do not agree with the plaintiff that the oral distributorship agreement is unenforceable because of the Statute of Frauds. I find that there was a written agreement between A.S.I. and Conceptual as reflected in exhibit 15. This was a sufficient "writing" to satisfy the statute, and, as the defendant argues in its brief, the parties operated under this written agreement's terms. However, it is enforceable *only* to the extent of the terms as actually set forth therein. R.I.Gen.Laws Sec. 6A–2–201 (1956). Therefore, the agreement made in March of 1978 for five years, expired in March 1983. In 1983, but prior to March 1983, Conceptual made only 2 direct sales (Defendant's exhibit 2(K)). In 1981 there

were three sales and in 1982 there were 6. In total, then, the defendant can recover for eleven sales, which loss amounts to $22,000.

#### 2. Lost Prospective Profits.

Defendant Lajoie further claims that A.S.I. was the victim of a wholesale financial calamity directly attributable to Brastow's actions. She describes the collapse of the business as a chain reaction: A.S.I. had to pay legal fees to defend itself in the law suit started by Brastow; this impinged on the company's cash flow which, in turn, curtailed payments to A.B.I. and the Small Business Administration ("SBA") on A.S.I.'s financial obligations to them; the lost sales and the demands for payments from A.B.I. and SBA pressured A.S.I. to the point where it could no longer continue to operate. Ms. Lajoie claims that the ultimate loss of this business has deprived her of $80,000, which she would otherwise have realized. This computation is based on the $15,000 to $20,000 profit margin actually realized in 1984 projected in the same amount for 1985, 1986, and so on to date.

Lost prospective profits are recoverable, if proximately caused by the plaintiff's conduct, and calculated "with a fair degree of certainty":

> ... Turning to the Massachusetts law on recovery of loss of profits consequent on breach of contract, we find the rule is: "When a claim for prospective profits is brought * * *, recovery can be had where loss of profits is the proximate result of the breach, and is such as in the common course of events reasonably might have been expected, at the time the contract was made, to ensue from a breach, and where it can be determined as a practical matter with a fair degree of certainty what the profits would have been." *John Hetherington & Sons v. William Firth Co.*, 1911, 210 Mass. 8, 21, 95 N.E. 961, 964. A frequently cited case on this point requires that loss of profits "be susceptible of proof by evidence reasonably certain, and not resting chiefly on speculation, conjecture or surmise." *Randall v. Peerless Motor Car*

Co., 1912, 212 Mass. 352, 380, 99 N.E. 221, 229.

*J.H. Horne & Sons Co. v. Bath Fibre Co.*, 272 F.2d 8, 11 (1st Cir.1959). There was no evidence disputing the projections offered by Lajoie, and so I award damages in the amount of $80,000 as lost prospective profits. Again the Statute of Frauds is no bar to this recovery. Conceptual's monopolistic practices prevented A.S.I. from freely competing in the relevant market for the sale of automatic welders manufactured otherwise than by Conceptual.

### 3. Total Damages.

The total damages hereby awarded to A.S.I. is $102,000.00.

### D. *Lajoie Damages Expenses*

### 1. Personal Expenses.

■ Ms. Lajoie seeks $70,000 for lost wages, $4,000 paid as legal fees in this action, and $110,000 representing a personal mortgage liability. This latter obligation is the balance on a $150,000 SBA loan, secured by a mortgage on her home. When Lajoie no longer could maintain her SBA payments, the SBA took over all her business assets and left her with this $110,-000 debt.

With the exception of the $4,000 paid as legal fees, I feel constrained to deny the remaining $180,000. Conceding Ms. Lajoie borrowed $150,000 from the SBA for her business and that she subsequently lost this business allegedly due to Brastow's conduct, it does not follow, as I see it, that she is entitled to the balance of $110,000 that is still due. The allowance of this amount would have to find its foundation in the conclusion that the whole future success of A.S.I. was assured, absent Brastow's activities. To me, this is much too speculative; it cannot be said, with a reasonable degree of certainty, that A.S.I. was thus assured of success. I cannot accept Lajoie's conclusory statement as sufficient evidence to support this claim. The same is true as to the alleged $70,000 in lost wages. I allow Ms. Lajoie's damages in the amount of $4,000 as personal expenses.

In summation, the following damages are hereby awarded:

| A.B.I. DAMAGES: | |
| --- | --- |
| Lost Profits on Sales | $ 85,600.00 |
| Attorney's Fees and Costs of Defending Suit | $110,882.52 |
| SUB–TOTAL | $196,482.52 |

| A.S.I. DAMAGES: | |
| --- | --- |
| Lost Profits on Sales | $ 22,000.00 |
| Lost Prospective Profits | $ 80,000.00 |
| SUB–TOTAL | $102,000.00 |

| LAJOIE DAMAGES: | |
| --- | --- |
| Personal Expenses | $ 4,000.00 |
| SUB–TOTAL | $ 4,000.00 |
| TOTAL DAMAGES | $302,482.52 |

Plaintiff will pay the above damages to defendants in accordance with the terms of the statute. Defendants will prepare an order accordingly.

EXHIBIT

# FUSION INDUSTRY BEWARE!

## Conceptual Engineering Associates, Inc. of Foxboro, Massachusetts

is defending its rights as the owner to a patent for an Automatic Fusion Welder (U.S. Pat. No. 4,215,262).

Suit has been filed in the United States District Court for the State of Rhode Island:

### Docket No. 84-0054P

*ANY PERSON who infringes our patent or aids in that infringement by manufacturing, selling, buying, leasing, or using an infringing automatic welder, without authority from Conceptual Eng. Assoc. Inc. may be held liable for damages.*

**NO PERSON CAN GUARANTEE PROTECTION TO AN INFRINGER FROM SUIT OR LIABILITY.**

Our automatic Fusion Welder is only available through ourselves at 61 Green St., Foxboro, MA (617-543-6511) and our representative, Stan Rubenstein Assoc. Inc., also in Foxboro at

## (617-543-4111)

1276

# FUSION CONFUSION

Let us take the con out of fusion for you. Conceptual engineering has invented and holds the only patents on the Automatic Fusion and Lightning Link Welders. Conceptual, the leading manufacturer of automatic fusion welders is not associated and never has been with any other fusion welder company. Conceptual has been here and servicing its customers for over ten years. Beware of fly-by-night infringer, will they be here tomorrow? Remember, buyers are subject to infringement laws. Be safe buy from Conceptual Engineering.

See us at Booth 53 with some New and exciting jewelry equipment.

 **Conceptual Engineering Assoc., Inc.**
61 Green Street, Foxboro, MA 02035
(617) 543-6511